UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | . |
| | . |
| Plaintiff, | . CR No. 21-0216 (JDB) |
| | . |
| v. | . |
| | . Washington, D.C. |
| LEO BRENT BOZELL IV, | . Wednesday, September 6, 2023 |
| | . 9:46 a.m. |
| Defendant. | . |
| . . . . . . . . . . . . . . . . . | . Pages 1 through 167 |

DAY 1
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Government:             ASHLEY AKERS, ESQ.
                               BRENDAN BALLOU, ESQ.
                               U.S. Attorney's Office
                               601 D Street NW
                               Washington, DC 20530

For Defendant:                 WILLIAM L. SHIPLEY, ESQ.
                               Law Offices of William L. Shipley
                               PO Box 745
                               Kailua, HI 96734

Court Reporter:                BRYAN A. WAYNE, RPR, CRR, CCP
                               U.S. Courthouse, Room 4704-A
                               333 Constitution Avenue NW
                               Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

# C O N T E N T S

Government Opening Statement ............................ 11
Defense Opening Statement .............................. 18


## TESTIMONY

ADAM DESCAMP:     Direct Examination..................... 23
                 Cross-Examination..................... 47
                 Redirect Examination.................. 54

BRADLEY MURRAY:   Direct Examination..................... 56
                 Cross-Examination..................... 78

VICTOR NICHOLS:   Direct Examination..................... 84

KEITH ROBISHAW:   Direct Examination..................... 101
                 Cross-Examination..................... 144
                 Redirect Examination.................. 158


## EXHIBITS RECEIVED

Government Exhibit No. 400 ............................... 28
Government Exhibit No. 455 ............................... 30
Government Exhibit No. 405 ............................... 32
Government Exhibit No. 403 ............................... 33
Government Exhibit No. 423 ............................... 38
Government Exhibit No. 404 ............................... 41
Government Exhibit No. 1003 .............................. 45
Government Exhibit No. 1004 .............................. 63
Government Exhibit No. 1000 .............................. 69
Government Exhibit No. 1005 .............................. 74
Government Exhibit No. 1002 .............................. 75
Government Exhibit No. 1006 .............................. 87
Government Exhibit No. 1007 .............................. 90
Government Exhibit No. 407 ............................... 92
Government Exhibit No. 1008 .............................. 96
Government Exhibit No. 100 ............................... 98
Government Exhibit No. 1011 .............................. 108
Government Exhibit Nos. 101-140 .......................... 114
Government Exhibit No. 1013 .............................. 116
Government Exhibit No. 435 ............................... 125
Government Exhibit Nos. 301-305 .......................... 131
Government Exhibit No. 438 ............................... 134
Government Exhibit No. 1009 .............................. 136

P R O C E E D I N G S

THE DEPUTY CLERK:  Good morning, Your Honor.  We're on the record in criminal case 21-216, United States of America versus Leo Brent Bozell.  Starting with government counsel, may you please approach the podium and state your appearance for the record.

MS. AKERS:  Good morning, Your Honor.  Ashley Akers for the United States.  With me at counsel table is Brendan Ballou, co-counsel, Special Agent Daniel Wright, and our paralegal specialist, Aschya Boone.

THE COURT:  Good morning to all of you.

MR. SHIPLEY:  Good morning, Your Honor.  William Shipley on behalf of defendant Leo Bozell, who is present with me at counsel table.

THE COURT:  Good morning to each of you.  All right. We're ready for a bench trial in this matter.  Let's do a couple of preliminary things to begin with.  Are there any changes in the anticipated witness list, particularly for the government I think it would be that I'm looking to know whether we're still dealing with as many as 13 or whether we're on a more reasonable footing.

MS. AKERS:  Your Honor, we have reached stipulations, and so we've culled that way back, so I believe we will have four government witnesses.

THE COURT:  That will give us a chance to get this

done.  Who will the four be?

MS. AKERS:  We will have United States Capitol Police Sergeant Adam DesCamp, which is No. 2 on the list.  We'll then have No. 6 on the list, United States Capitol Police Officer Bradley Murray.  No. 7, Sergeant Victor Nichols.  And No. 10, Officer Keith Robishaw.  And then I guess we'll actually have the additional fifth, which is our testifying case agent, Daniel Wright, which is not on the list --

THE COURT:  I was going to say -- not listed here.

MS. AKERS:  -- but he will be testifying.

THE COURT:  Okay.

MS. AKERS:  Thank you, Your Honor.

THE COURT:  All right.  In addition to that -- I'm not going to try to go over the exhibits and any changes to the exhibits by virtue of the stipulations.  That will just happen in terms of introducing and admitting exhibits as we go along. But what else do we need to talk about before we begin with any opening statements that each side wants to make?

MS. AKERS:  Sure, Your Honor.  If we could just very briefly, could I discuss the stipulations?  I think it will help Your Honor understand what we're doing here.  The parties have agreed to a document that's 13 pages in length that we will move to admit into the record here.  It's stipulations that cover many facts.  I want to point Your Honor specifically to --

THE COURT:  It would be easier to point me if you have a copy for me.

MS. AKERS:  Sure thing.

(Document tendered to the Court.)

THE COURT:  Thank you.  Now please go ahead, Ms. Akers.

MS. AKERS:  As Your Honor can see, this is a 13-page document.  The first page is the general Capitol building and grounds, background information.  The second page is a stipulation that relates to the certification of the Electoral College vote.  The third page relates to the civil disorder. The parties have agreed that what was happening at the U.S. Capitol building constitutes a civil disorder.

The fourth page, Your Honor, you'll see a stipulation to interstate commerce, which is relevant to the civil disorder charge, as well as the federally protected function that the parties have stipulated to.  That's also relevant to the 18 U.S.C. 231 charge.

On page 5 you'll see a stipulation that the officers from Capitol Police and the Metropolitan Police Department were engaged in official duties, which is relevant to several of the counts.  And then on page 5 you'll also see a stipulation to the authenticity and admissibility of the CCTV, which will be an entire government exhibit series.

We have on page 6 a stipulation to the Senate and House recording studios.  These are the videos that were in the

Senate floor.  We call them the C-SPAN videos.  So we've agreed to the admissibility of those.  We also have an agreement to the admissibility of our open-source footage.  That's Exhibit 400.  That will be a bulk of the video evidence that Your Honor sees during this trial.

On the bottom of page 6 we have a stipulation to the admissibility and authenticity of photographs that we'll be using.  Those are series 200.  And then on page 7 we have a stipulation to montage videos.  We're not going to show those to Your Honor.  I understand Your Honor has already seen those in prior trials, but we will introduce those into evidence when we move these stipulations here.

And then importantly in this case, on page 7 to page 8, the parties have agreed to stipulated testimony for four witnesses, a couple of whom I believe Your Honor has already heard from.

The first is Captain Mendoza from the United States Capitol Police.  This is what we typically call our overview witness for January 6 cases.  She describes in the transcripts that we'll move into evidence and the accompanying exhibits the restricted perimeter, the events of January 6, the overview that Your Honor's already very familiar with.

We then have agreed to stipulate to the testimony of Lanelle Hawa from the United States Secret Service.  This testimony in sum and the subparts, which are her exhibits,

are that the vice president was in the building on January 6 protected by the Secret Service, therefore there was the restricted perimeter set up.

Next the parties have agreed to Daniel Schwager, the former general counsel for the U.S. Senate.  His testimony, he talks about the official proceeding that was going on, that there was an evacuation of the president and the House and the Senate, and sort of the events that had to take a recess because there were people unauthorized in building.

And then finally the parties have agreed to the stipulated testimony of Edgar Tippett.  He's our Safeway witness that goes to the civil disorder count that Your Honor's also familiar with.

And then -- we're wrapping up here.  On page 8 the parties have agreed to the standard protocols for device extraction for Mr. Bozell's cell phone.  This will obviate the need to call the CART agent.  He agreed we performed the extraction correctly.

Page 9, the parties have stipulated to the repair cost for the door and the window.  Your Honor will see that.  Those are Counts 1 and 2 relating to the 18 U.S.C. 1361 charges.  We've stipulated that the costs for the repair on both of those charges exceeded $1,000.

THE COURT:  You said Counts 1 and 2, I think.  Did you mean Counts 2 and 3?

MS. AKERS:  That's correct, Your Honor.  Sorry about that.  Thank you.

THE COURT:  That's all right.

MS. AKERS:  And then finally, on pages 9, 10, 11, 12, you'll see that the defendant has stipulated to his identification, that he is the person charged in the superseding indictment, and that the photos that we've provided in the stipulations are in fact him.  He stipulated to the attire that he was wearing.  You'll see that on page 9.  And that will be relevant as you review videos during this trial.

And then on the final page that we'll submit to Your Honor, there will be signatures on that page.

So the government moves to admit the stipulation of the parties as well as all of the stipulated testimonies, which is the 900 series and all of their subparts into the record.

THE COURT:  All right.  So first question, Mr. Shipley, do you agree to the stipulation and the admission of it as --

MR. SHIPLEY:  Yes, Your Honor.  I believe Ms. Akers has a version of that that's signed by both my client and I.  So we are in agreement with that.  We talked about these, both my client and I as well as Ms. Akers and I have talked about these at some length.  And consistent with my trial brief, we're not here to deny the obvious, as I've said.

THE COURT:  I think you did say that.

MR. SHIPLEY:  I think probably the only issue that I would raise is when I received the government's exhibits for trial, I think they numbered over 500 individual items.  Not suggesting that she intends to introduce --

THE COURT:  My guess is they're not going to actually introduce --

MR. SHIPLEY:  But it kind of put me in a little bit of a conundrum.  It's like, well, I'm not sure what's going to come in here until she says I want to put this in.  So I guess probably the only thing I want to say at this point is I need to reserve the opportunity to maybe object to something because the numbered exhibits that she's actually put forward is far in excess of what I anticipated.

Now, what I think she's done -- I could be wrong -- is she's simply marked for identification source material, and then she's extracting exhibits from the source material, which that's fine.

THE COURT:  We'll see where we go.  I don't think the stipulation is going to be taken as limiting your ability, with respect to exhibits that aren't specifically identified in the stipulation, to make objections.  And I agree with you that there are a lot of exhibits on the government's exhibit list, and it's unlikely that all of those will be offered and admitted into evidence.

MR. SHIPLEY:  And that's fine.  I guess -- I had

another thought, and now it is... time marches on for all of us.  My thought just escaped me.

THE COURT:  It may come back.  It may come back.

MR. SHIPLEY:  I'll let you know when it occurs to me again.  But at this point, we're generally in agreement.  We're ready to go forward.

THE COURT:  I thank the government and Mr. Shipley and Mr. Bozell, obviously, for their conscientious efforts and the stipulations which should make this trial more manageable for everyone.

MR. SHIPLEY:  Thank you, Your Honor.

THE COURT:  All right.  With that, the only thing that I would also note is that on the transcripts of witness testimony, you're going to have to provide those to me at a time when I can then read them.  You're not going to read them into the record.

MS. AKERS:  That would be my hope, Your Honor.  We will provide those today to you.

THE COURT:  So I can read them before I need to render a decision in the case.

MS. AKERS:  Of course.

THE COURT:  All right.

MS. AKERS:  And with that, Your Honor, the government does have a very brief opening statement that we would like to provide.

THE COURT:  And Mr. Shipley, you indicated that yours would be very brief.

MR. SHIPLEY:  I may have to revisit that now depending on what I hear.

THE COURT:  All right.

MR. SHIPLEY:  I expect it will be brief.

THE COURT:  All right.  Well, let's begin with the opening statements, and then we will go into the first witness.  Will the order of witnesses be as they are listed on your witness list, starting with Sergeant DesCamp?

MS. AKERS:  Yes, Your Honor.  This will be the order that they will be presented.

THE COURT:  Okay.  Mr. Ballou.

MR. BALLOU:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BALLOU:  Can you see the presentation?

THE COURT:  I can.

MR. BALLOU:  And if you'd prefer a printed copy, we can also give that to you.

THE COURT:  I don't need a printed copy.

GOVERNMENT OPENING STATEMENT

MR. BALLOU:  Your Honor, as Ms. Akers mentioned, we will endeavor to make this brief, but we want to help direct you to understand what we're using each witness for.

Your Honor, we're here today to discuss the actions of

Leo Brent Bozell on January 6.  I obviously don't need to recite the actions that day.  You're well familiar with them.  Suffice to say that Mr. Bozell's actions were not just an attack on law enforcement and potentially elected officials, but on our democratic institutions and what makes your time here so very important.

This is Leo Brent Bozell standing in the well of the Senate.  This was just one of the dozen or so places where he went in and around the Capitol that day.  In fact, he was one of the most active rioters in the Capitol building on January 6, helping to break windows, test doors, disable cameras, and generally help his fellow rioters overtake the Capitol.

A review of Bozell's text messages before January 6 reveal several things:  He believed that the election results were fraudulent and that Donald Trump should have won.  He was well familiar with the congressional proceedings taking place and the process for the election certification.  He encouraged others to go to the Capitol on the 6th, and he even helped to organize entertainment for that weekend.

Most importantly, he prepared for violence, writing "I almost hope it goes south on the 6th.  Let's just take the Capitol and hang these pedo-satanist traitors."  He said, "No, I'm bringing lighters, fire starters."  And "Biden will never be sworn in.  We'll have World War IV before that happens."

Now, on January 6, Bozell first trespassed over the -- and made -- on January 6, Bozell first trespassed over the restricted perimeter that prohibited the public from entering the Capitol grounds, and made his way to the base of the building's western steps.  There he climbed a bike rack that had been turned into a makeshift ladder and got under the scaffolding that had been erected for the inauguration in a few weeks' time.

Once under the scaffolding, he climbed up the Capitol steps where, confronted by police, he tried to rip the tarp that was blocking rioters from advancing further towards the building. Bozell was part of the very first group to make it up that far on the steps.  Bozell tore his way through the tarp and made his way to the mezzanine of the Capitol steps, where he and other rioters were confronted by a line of officers.  Closed circuit television shows Bozell yelling at officers and waving over more agitators.

Then at 2:09 p.m., protesters yelled:  "Are you ready to push?  Let's go."  Bozell leaned forward and pushed the line of officers as rioters overwhelmed the police.  Up the stairs, Bozell looked back at what the rioters had already accomplished as he joined the very first group to reach the Upper West Terrace.

Bozell then made his way to the Senate side of the building, where third-party footage shows him pointing rioters

to the Senate Wing doors, the same doors through which so many rioters ultimately entered the building.

There, Bozell appeared to pick up something heavy from the ground.  He then rushed to the Senate Wing Door, where he used what appeared to be a rock to smash the door's inset window pane.  He then moved a few feet over to smash the Senate Wing Door itself.  These actions form the basis for Bozell's destruction of property charges.

As rioters began to stream into the Capitol, Bozell climbed in through the windows he helped to break, traveling over toppled furniture and shattered glass.  He did so at 2:13 p.m., making him one of the very first rioters to enter the building.  As he entered, Bozell wore some distinctive clothing that you saw on the second slide there, sunglasses, a hat, a blue hoodie that you'll see says Hershey Christian Academy on it.

Now, for nearly an hour Bozell traveled through the Capitol building, helping fellow rioters where he could.  Now, to save you time we are not going to go through every motion in that hour, but I want to point out a few highlights.

Here he was, for instance, at 2:17 p.m. at the Ohio Clock Corridor, feet away from the Senate Chamber where senators and the vice president still were.  There, police formed a fragile line to prevent rioters from advancing.  Here he was, trying to enter the office of the Senate Majority Whip.  Now, that

door was locked, but he was ultimately able to enter another closed door before being escorted out by police.

Here he is on the ground floor, joining other rioters near the carriage entrance, where crucially, as police tried to escort rioters out of the building, Bozell chose to stay. Here he is, back on the second floor, entering the Great Rotunda.

Around 2:38 p.m., nearly an hour after -- half an hour after he entered the building, Bozell made his way to the Rotunda door, into the Capitol's east side. There, rioters inside the building fought police who were trying to prevent other rioters from getting inside. Bozell joined the mass of people that were pushing against the police, almost crushing them, until they succeeded in opening the doors and letting the mass of rioters in.

Bozell then traveled to the third floor -- and recall, Bozell had been on the second floor, then the first floor, then the second floor, now he's on the third floor again -- and joined the group of rioters who overtook officers to breach the Senate Gallery. Rioters succeeded in getting in the gallery that overlooked the well of the Senate. And here Bozell did something very important.

C-SPAN cameras flanked the well to record what happened below. Bozell moved the camera to face down so that it couldn't record what was happening in the Senate itself.

Bozell then went back down to the second floor, into the Senate Chamber, and went up to the well.  Bozell's actions in the gallery, on the floor of the Senate, along with others, show his intent to obstruct an official proceeding.

And this brings us back to the first photo, a photo of Bozell looking out at the captured chamber, surveying what he and others had accomplished.  Bozell eventually left the Capitol at 3:07 p.m., nearly an hour after he first entered through the broken window.

But after January 6, Bozell did not express remorse. Rather, he was proud of his actions.  In subsequent text messages he wrote:  "Capitol siege is morally justified." "Someone needs to show these pictures to Dad.  Then Dad needs to reconsider condemning all violence."  And, "If power is stolen by child rapists and murderers, then any attempt to stop them is morally justified."

For his actions, Bozell was charged with 10 crimes: Count 1 charges him with obstruction of an official proceeding for, among other things, disabling the C-SPAN camera and entering the Senate Chamber.  Counts 2 and 3 charge him with destruction of property for damaging the Senate Wing Door and window.  Counts 4, 5, and 9 charge him with civil disorder, assault, and physical assault, for shoving the officers on a Capitol steps mezzanine.  Counts 6, 7, 8, and 10 charge him with misdemeanors for trespass and disorderly conduct in a

Capitol building or grounds.

Let me very briefly summarize how we plan to proceed here. The following Capitol Police officers will testify:

Officer Adam DesCamp, who we will call first, will explain how the Capitol stairs were overrun.

Officer Bradley Murray will describe Bozell's attack on officers along the stairs mezzanine.

Sergeant Victor Nichols will describe how Bozell and others broke in through the Senate Wing Door.

And Officer Keith Robishaw will describe how Bozell overtook the Senate floor.

Finally, Special Agent Dan Wright of the FBI will testify about the investigation into Bozell himself, including how he was identified, and the contents of his cell phone communications.

Your Honor, I'll close simply by noting I know that you've seen many of these cases, but your care and attention here will help to ensure that the sorts of attacks on our law enforcement and our institutions, attacks that Mr. Bozell committed, never happen again.  With that, we're ready to proceed.

THE COURT:  All right.  Mr. Shipley.

MR. SHIPLEY:  Good morning.

THE COURT:  Good morning.

DEFENSE OPENING STATEMENT

MR. SHIPLEY:  I think something the Court will be struck by as we work through the evidence in the case, and particularly the videos, is how still images sometimes don't reflect the actual video.  You're going to see many videos probably in defense case of Mr. Bozell simply walking around, by himself, engaging in casual conversation with various law enforcement officers inside the Capitol, but not doing much of anything.

In fact, the one that strikes me is where he's the -- government says he's attempting to open the Senate Minority Whip's door.  He's walking down the hallway.  He passes by the door.  He reaches out, grabs the handle, doesn't open, and he keeps going.  No real effort to find his way into places where he shouldn't go, and in fact, when he gets into the Senate Chamber, he's escorted into the Senate Chamber.

Without question, law enforcement inside the building in this time frame was far outnumbered.  And I think as one -- Officer Robishaw said -- I won't use his exact language, but he said, we were just trying to manage a terrible situation.  Fair enough.  They weren't in a position where they could arrest everybody inside, couldn't be done, so the best you could do is just manage your way through a bad situation until you can address it appropriately.

Mr. Bozell's not a problem for them.  You'll see many

videos.  Mr. Bozell is just walking around and nothing else.  So let's talk about just for a moment how he got into the building.  I think one thing you will see demonstrated in the video of him breaking two windows -- first he breaks the glass doors on the Senate Wing doors, the doors that actually open, two panels of glass on each door.

He strikes it nine or 10 times with the object in his hand, which he had picked up in the grass.  You saw that still image of him reaching down into the grass.  I think what he would describe it as is a metal or iron drain cover for -- you know, water drain.  But he only strikes the glass until it fractures, and he stops.

And then he does essentially the same thing to the window glass.  He breaks it until it fractures, and then he stops -- unlike video you will see of Mr. Pezzola, who's famous for using a police shield to knock out the windows on the other side, keeps beating on them until they're gone and two openings are created and people start crawling in.

The distinction I think is meaningful.  Both acts are destruction of government property as charged under 1361.  But one act is simply an act of vandalism.  The other act is somebody who is making every effort they can to gain access to the building.

I think a clarification that the Court will see and a conclusion that the Court will draw when watching the videos is

that Mr. Bozell was engaging in vandalism.  He was not actually trying to break into the building.  He took the opportunity to go inside once the windows were broken out by others and many people had gone in front of him.  Foolish.  Unlawful.

Wandering around inside the building, not allowed.  The building was not just closed on January 6, it was closed for Covid for many months up to January 6.  There were plenty of objective indicators that should have led Mr. Bozell, as well as the hundreds of other people who went inside, to conclude this is not a normal day to enter into the Capitol and wander around as a tourist.  Wasn't objectively reasonable to do that.

That's why I'm making this argument.  I may sound like a prosecutor, but what I'm telling you is we didn't come here to deny the obvious.  He made a lot of mistakes in judgment that day.  But he was not there to attack the Congress, to interfere with the Congress, to interfere with the transfer of power.

He was by himself.  He had been with his brother earlier in the day.  He was walking back to his car, which was on the other side of the Capitol where he had parked that morning, the same place he had parked the day before, so he knew parking was available, and he was simply drawn to the growing crowd at the Capitol grounds, and from that point, curiosity took over.

You will not see any video of him actively, aggressively engaged with the police.  In fact, you know, the government put

a caption on one of those still images of him pushing on the bike rack.  The video doesn't show him pushing on the bike rack.  It's his hand on the bike rack, but he's not pushing on the bike rack.  At no time, at no place does he attack the police.

And I'm going to reserve until you actually see the video my comments about pushing through the police line at the top of the stairs, which forms the basis for the added charge which pushed us back from our May trial date to today: the 111(a) count charged with the group at the top of the stairs who overcomes a line of six officers standing in their way, and then from that much it's pretty much the crowd is on its way to the Senate side of the building.  Sort of half of the crowd goes straight; Mr. Bozell and the other half of the crowd turn to the right and head for the Senate Wing doors.  Several hundred people at that point.

But what exactly happens at that point where he pushes through the officers, or, more accurately, where he's with a group of other people who pushed through the officers, we're going to reserve.  Because I want you to form your own opinion when you see the video; it just does not support the point -- the argument that the government's making.

At the end of the day, I expect the Court will hear from Mr. Bozell, because one thing the government cannot offer to the Court, and I'm troubled by the way they have gone about it in other cases, is they simply assume and characterize events in

the worst possible light.  But Mr. Bozell can offer you exactly what his thinking was.  He can tell you exactly what his feelings were about the election that led him to the protest and there that day.

And I will simply point this out for Mr. Bozell, and I'll leave it at this, and we'll get into some more later: Mr. Bozell is a resident of Pennsylvania.  Lives in Hershey, or near Hershey.

In the aftermath of the election, good or ill, rightly or wrongly, the State of Texas sued the State of Pennsylvania under the original jurisdiction of the Supreme Court for election irregularities in changes that the Pennsylvania Supreme Court made to its own election laws in advance of the election.

Yes, Mr. Bozell was suspicious about the outcome, but so were the legislators in Texas.  I don't know that it is fair to say that the views of several million Americans in December and early January of 2020 were so crazy and off base, based upon the lens at which we view them through today.  We know so much more today than any of those people knew in that time frame.

So as I'm sure this is no revelation to the Court, you need to wait, listen to Mr. Bozell, then you'll have a complete picture of what brought him there that day and what motivated his conduct and what did not.

THE COURT:  All right.  I thank both counsel, and we're ready to proceed with the first witness.

DEFENSE OPENING

MR. BALLOU:  Your Honor, we'll call Sergeant Adam DesCamp, who is entering.

ADAM DESCAMP, WITNESS FOR THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. BALLOU:

Q.   Can you please state your name.

A.   Adam DesCamp.

Q.   Where do you work?

A.   United States Capitol Police.

Q.   How long have you worked there?

A.   Going on 18 years now.

Q.   And what's your current position?

A.   I'm the lead firearms instructor for the Capitol Police.

Q.   And before you were at the Capitol Police, what did you do?

A.   I was in the military for eight years.

Q.   And what was your title in the military, what rank?

A.   I was a staff sergeant in the Army, active duty military police.

Q.   Were you deployed anywhere?

A.   I was.

Q.   Where?

A.   Multiple deployments to both Korea, Afghanistan, Israel, and that's pretty much it for the deployments, just location-wise in those different countries.

Q.    What was your title or rank on January 6, 2021?

A.    I was a sergeant on the less lethal team.

Q.    And can you describe briefly what the less lethal team is?

A.    Less lethal team is a branch of the Civil Disturbance Unit.  Most of us are all instructors for civil disturbance.  The less lethal team is the people that are trained in all the different techniques and tactics for -- or weapons systems that are less lethal in nature.

Q.    And for those of us who aren't particularly familiar with the range of weapons here, can you give us an example?

A.    Sure.  PR-24 baton, ASP baton, pepper spray, Sabre Red, all different types of deployment -- methods of deployment, whether it be handheld grenades or Mark 9, Mark 60, different pepper spray aerosol dispenser systems.  And then you have the FN 303, which is essentially a higher-powered paintball gun and then -- or paintball launcher, I'm sorry.  And then there's the pepper-ball system, which is another launcher that we have.

Q.    As part of your work either on the less lethal team or somewhere else, were you ever given training on de-escalation tactics?

A.    Yes.  Yes, we were.  I think all officers get the -- especially Capitol Police get the Verbal Judo de-escalation training.  That all comes in the academy.

Q.   And when you say "Verbal Judo," is that a known term?

A.   Verbal Judo is what -- it's an actual known term, at least for Capitol Police for what I went through.  We all used the term "Verbal Judo."  It's an actual class we attend, yes.

Q.   And we don't need to belabor this, but just very briefly, what does that Verbal Judo entail?

A.   It's just de-escalation techniques using, you know, words.

Q.   Where did you begin your day on January 6, 2021?

A.   I was on the east front of the Capitol; that was where I was posted.

Q.   And what were you assigned to do?

A.   I was assigned to the less lethal team.

Q.   And tell us how your day began.  We don't need to belabor this, but we just want to understand generally what your journey was that morning.

A.   It was about six o'clock.  We went in and we got all of our weapons systems loaded up on the truck.  We went and we assumed our positions, whether it be east front, west front, whatever barricade it was, and then we just posted up for the event that was about to unfold.

Q.   And you alluded to the event that was about to unfold.  What happened?

A.   Well, actually, we heard -- myself and my partner, her name is Officer Kerkhoff, we heard over the radio that the

inspector, Inspector Lloyd, he was on the west front at the time, he was requesting less lethal to launch their weapons systems. To us, that set off alarm bells because the less lethal weapons systems that we had had never been deployed up until that point in time. We've never actually launched on individuals until that day.

So it set off an alarm. Officer Kerkhoff and I decided to respond over to try to help and to assist. So we ran into the Capitol, the Capitol went into lockdown, so the doors locked so we couldn't get out, so we had to respond back through the way that we came in and run around the Upper West Terrace all the way to get to the west front where the situation was taking place.

Q. When you got to the west side, what did you see?

A. I got to the west side, and I was on the stage area, the inaugural stage area, but I could see that there was a -- an extensive amount of people pressed up against the -- there's a police line established on the Lower West Terrace and they were all tussling back and forth and, you know, going at it. It was definitely a, you know, an incident where the less lethal team was necessary there.

Q. And you'd been working for the Capitol Police for a long period at that point, you'd been in the military. What was your first reaction when you saw it?

A. My first reaction was surprise. I didn't expect to see

anything like that, I didn't expect to see people fighting with officers.  It just -- I was kind of stunned by the whole thing.

Q.    We'll get to the video in just a moment, but after you made it to the west side, then what did you do?

A.    Eventually I was flagged down by Inspector Hyman, who was over on the Senate side of the scaffolding steps, the Senate side steps area of the Capitol, leading up to the Upper West Terrace.  And she was waving at us to get our attention, so myself and Officer Kerkhoff responded over to assist and see what she had going on over there by the side of the scaffolding.

And it was demonstrators that were actually on the railing and in a small narrow walkway of steps leading up to the Upper West Terrace that they -- they were trying to push their way up there.

Q.    I'm pulling up what's been marked as Government Exhibit 400.  Start from the beginning.  I'm pulling up what's been marked as Government Exhibit 400.  We'll play this for about 10 seconds.

(Video played.)

Try that again.  Play Exhibit 400 for just a few more seconds.

(Video played.)

Sergeant, where was this video taken?

A.   This is on the Senate side steps location at the bottom of the scaffolding.

Q.   And very approximately, when would this video have been taken?

A.   Probably around twelve o'clock that day.

Q.   At that time where would you have been relative to this video?

A.   I was up at the top of the scaffolding, either at the center inaugural stage area or at the corner of the scaffolding here.

MR. BALLOU:   Your Honor, given the defense has stipulated to the authenticity of the 400 series, we'd move to admit Government's Exhibit 400.

THE COURT:   Without objection, 400 is admitted.

(Government Exhibit No. 400 received into evidence.)

MR. BALLOU:   I'm going to play until 19 seconds.

(Video played.)

BY MR. BALLOU:

Q.   Sergeant, can you describe the man on the left?

A.   Sure.   He's like wearing a blue hoodie, looks like orange lens sunglasses, and a hat.

Q.   Just so we can situate ourselves, do you see in the middle sort of the man in the Revolutionary War outfit?

A.   I do.

Q.   And Sergeant, I notice you're looking at that computer.
Is that computer for you not working?

A.   It's not on, no.

(Deputy clerk assists.)

Q.   Can you see it?

A.   Yeah.

Q.   Great.  I'm going to pull up next what's been marked as
Government's Exhibit 455, and again I'm just going to play for
a few seconds here.

(Video played.)

Sergeant, where is this video taken?

A.   It's the same spot.  It's in the Senate side steps area
of the scaffolding.

Q.   And do you see the man in sort of the Revolutionary War
garb here, as we situate ourselves?

A.   I do, yes.

Q.   I don't know if you can see my cursor, but do you see the
man in the blue hoodie below?

A.   I do.

Q.   Okay.  I'm just going to play for a few seconds here.

(Video played.)

Okay.  At this point, what are the rioters trying to do?

THE COURT:  Are we going to admit this into evidence?

MR. BALLOU:  Your Honor, of course.  The government
moves to admit Exhibit 455.

MR. SHIPLEY:  No objection.

THE COURT:  Without objection, 455 is admitted.

(Government Exhibit No. 455

received into evidence.)

BY MR. BALLOU:

Q.   Sergeant, let's set some preliminaries here.  Where would you have been at this point?

A.   I'm right here on the corner of the scaffolding.

Q.   Okay.  Were you able to see yourself in this video at all?

A.   I wasn't in that, the last couple seconds of that video, no, but I'm definitely right around in that area, as I saw my partner was there.

Q.   Okay.  And what are the protesters trying to do at this moment?

A.   They're trying to breach up the top of the steps there on that landing, on the edge of the scaffolding.

Q.   And what are the police trying to do?

A.   We're trying to keep them down the steps.

Q.   Are you succeeding?

A.   For the moment, yes.

Q.   Okay.  What happens then?

A.   They started tearing into the scaffolding itself, removing the tarp and cutting the tarp away, climbing inside the scaffolding.  Once you get in there, there's a center

walkway area where it would be much easier access for them to get up.

Q.   And we'll look at some more videos with the tarp but could you just explain why was cutting the tarp important for the protesters?

A.   Well, it gave them a different avenue of approach that -- another place where we didn't have enough officers to stop them from coming up.

Q.   I'm going to pull up Government Exhibit 405.  I'm going to mute this because it has -- the person who uploaded it had a soundtrack that I think is unnecessary.  And I'm going to advance to 2:10, play for about 20 seconds.

        (Video played.)

        Sergeant, where was this video taken?

A.   That's at the center area of the scaffolding where the walkway was.

Q.   Okay.  In terms of time, where does this match with the previous videos that we've been looking at?

A.   Not too long after.

Q.   Just a few minutes or --

A.   Yeah.  I'd say a few minutes after.

Q.   Okay.

        MR. BALLOU:  Government moves to admit Exhibit 405.

        MR. SHIPLEY:  No objection.

        THE COURT:  Without objection, 405 is admitted.

(Government Exhibit No. 405

received into evidence.)

MR. BALLOU:  I'm going back to 2:15 in the video.

(Video played.)

BY MR. BALLOU:

Q.   Do you see the man in blue?

A.   I do.

Q.   Can you describe him?

A.   Sure.  He's wearing the blue hoodie with the orange glasses, looks like a hat.  And the hoodie has like a white football shape on it.

Q.   And what do the rioters here appear to be doing?

A.   They're all breaking into the scaffolding area, getting into that center walkway where it's easy for them to come up.

Q.   Okay.  I'm going to pull up Government Exhibit 403.  Turn the sound back on.  Just play for a few seconds.

(Video played.)

Where was this video taken?

A.   That's the center of the scaffolding.

Q.   And can you situate it next to -- in relation to the previous video we saw?

A.   Yes.  I was up at the top here.

Q.   Okay.  And the previous video, was that roughly the same place or --

A.   Yes.

DESCAMP - DIRECT

Q.    -- a different location?

A.    It's the same.

Q.    Okay.  And where were you when this video was taken?

A.    I am up at the very top at the center.  You can't see it in this picture, really, but I'm directly at the far end of this video.

MR. BALLOU:  Government moves to admit Exhibit 403.

MR. SHIPLEY:  No objection.

THE COURT:  Without objection, 403 is admitted.

(Government Exhibit No. 403 received into evidence.)

BY MR. BALLOU:

Q.    Okay.  And I'm pausing at 4 seconds into the video, and I don't know if you can see my cursor but can you see the man I'm circling here?

A.    I do.

Q.    Can you describe him?

A.    Sure.  It's a white male with the orange lens glasses, looks like a blue hoodie, and a hat.

Q.    Is that the same man as the previous video?

A.    It appears to be, yes.

Q.    And can you just describe because, you know, the court record won't show the actual video, where is he now in relation to the previous video?

A.    He's inside the center scaffolding area all the way up

DESCAMP - DIRECT

at the top on the left.

Q.   I'm going to play until 27 seconds.  And to the extent you can, Sergeant, if you can listen to what the rioters are saying at this point, that would be helpful.

(Video played.)

Did you hear what the person said just there?

A.   "Pass this up" is what it sounded like.

Q.   And based on your experience in the scene of this moment, what do you think he meant by "pass this up"?

MR. SHIPLEY:  Objection.  Calls for speculation.

THE COURT:  I'll allow -- overruled.  I'll have him testify based on his experience.

BY MR. BALLOU:

Q.   Do you recall them passing anything up at that point?

A.   The bike rack.  There was a bunch of stuff, they were passing up shields that they had taken from officers, bike racks.  I don't even -- could have been a plethora of other things.

Q.   Well, let's focus on the bike racks specifically.  When they were pushing the bike racks up, what were they doing with those bike racks?

A.   They were positioning the bike racks to use against us, whether it be to move us out of the way with the bike rack or even attempt to throw it at us.

MR. SHIPLEY:  Objection.  Move to strike.  It's all

speculation.

THE COURT:  I do think that that last testimony was speculative.  I'll go ahead and strike it.

MR. BALLOU:  I'll rephrase the question if I may, Your Honor.

THE COURT:  Go ahead.

BY MR. BALLOU:

Q.   Did you see any rioters push the bike racks up the crowd?

A.   Yes.

Q.   What did you see them use the bike racks for?

A.   For using it against us, to push the officers out of the way.

Q.   Did you personally see that?

A.   Yes.

Q.   Can you describe an instance where that happened?

A.   Actually, we were holding a bike rack at a point in time, which was taken away from us, and then they used it -- they were like jousting us with this massive bike rack, or then they also used it to kind of gate us away, like push us away with it.

Q.   I see.  I'm going to play until 57 seconds.  While you're watching this, if you can pay attention to what's happening with the tarp on the side and above the steps, that would be helpful.

(Video played.)

Stopping at 56. What's happening to the tarps here?

A. They're cutting away at the tarp to remove it.

Q. And just so we're clear, by "they" you mean the protesters?

A. I'm sorry?

Q. By "they" you mean the protesters are cutting the tarp?

A. Correct.

Q. Again, why was it important for them to cut the tarp?

A. The more tarp that they removed, the --

MR. SHIPLEY: Calls for speculation and irrelevant.

THE COURT: Use your microphone, Mr. Shipley.

MR. SHIPLEY: Objection. We're talking about -- speculation and irrelevant. We're not talking about Mr. Bozell. We're talking about protesters.

MR. BALLOU: Your Honor, we'll very quickly -- sorry, go ahead.

THE COURT: The last part of the objection is overruled.

I think you need to rephrase to make it so that the officer is not just speculating.

MR. BALLOU: Understood, Your Honor.

BY MR. BALLOU:

Q. Sergeant, did you see the rioters cut the tarp?

A. I did.

Q. Once they cut the tarp, what were they able to do?

A.   They had access to up to the landing area where all the officers were at.

Q.   I'm going to play until 1:33.

(Video played.)

Sergeant, did you see the officers at the base of the steps?

A.   Did I see any officers there?

Q.   In this video right here, did you see any officers?

A.   I must have missed it.  I wasn't paying attention to that.  I'm sorry.

Q.   No, of course.  There's a lot going on here.  Let me go back a few seconds.  If you can focus on where the -- I'll use layman's terms, where the smoke bombs are going off, if you take a look here.

(Video played.)

Do you see the officers now?

A.   I did.

Q.   What are they trying to accomplish here?

A.   They're trying to get people away.

MR. SHIPLEY:  Objection, Your Honor.  We're talking about other officers, no foundation that this witness knows what the other officers are doing.

THE COURT:  You can ask him what they appear to be doing.

MR. BALLOU:  Of course, Your Honor.

BY MR. BALLOU:

Q.   Sergeant, based on your experience and your communication with officers that day, what do they appear to be doing?

A.   They were trying to push the people back, get them away from the scaffolding area.

Q.   And these smoke bombs, do you know what they are?

A.   I would have to speculate.  That's Metropolitan PD, whatever they were throwing, with handheld grenades.

Q.   I'm going to try to avoid further speculation here.

A.   Right.

Q.   So we'll move on to the next video.  I'm pulling up what's been marked as Government's Exhibit 423.  Play a few seconds of that.

(Video played.)

Sergeant, where is this video taken?

A.   It's at the center walkway of the scaffolding.

Q.   And where would you have been at this time?

A.   I'm at the very top of the center walkway.

MR. BALLOU:  The government moves to admit Exhibit 423.

MR. SHIPLEY:  No objection.

THE COURT:  423 is admitted without objection.

(Government Exhibit No. 423 received into evidence.)

BY MR. BALLOU:

Q.   I'm playing until 25 seconds.

(Video played.)

What are the rioters trying to do with the bike rack here?

A.   They're trying to take the bike rack away from us.

Q.   And to avoid speculation, you were at the top of the steps right here at this time?

A.   Correct.

Q.   Did you personally see any rioters taking bike racks like at this moment?

A.   I did.  I believe I'm in the next frame of this video.

Q.   Let's look at this a little further.  Let's play for a few more seconds.

(Video played.)

Do you see yourself at this point?

A.   I do.  I'm there with the gas mask, kind of blurry face in the back.  There.

Q.   I see.  So you're to the -- looking at the video, you're to the right of the person in the neon jacket?

THE COURT:  He can circle himself on the screen.

(Witness complies.)

THE WITNESS:  There we go.  That's me.

MR. BALLOU:  Thank you.

BY MR. BALLOU:

Q.   Okay.  So you personally witnessed this moment?

A.   Correct.

DESCAMP - DIRECT

Q.   And what are the protesters doing with the bike racks here?

A.   They're pulling them away from us.  One, so that we can't use them to block them from getting up, and then they're also, once they get them, to try to use against us.

Q.   And do you see the man in blue on the left?

A.   I do.

Q.   Can you describe him?  I know the video's a little grainy here.

A.   Blue hoodie, got the hood up and it looks like orange lens glasses on.

Q.   We can advance frame by frame here.  We're stopping at 35 seconds.  What is he doing?

A.   He's trying to tear the tarp away from the poles.

Q.   Is this the same man who we saw in the previous videos?

A.   It appears to be, yes.

Q.   I'm pulling up what's been marked --

        THE COURT:  You can remove the --

        MS. AKERS:  Your Honor, our screen is not working, and so I don't know that we'll be able to be removing the...

        MR. BALLOU:  Yes.  Unfortunately, the screen at the podium doesn't work either.  So I'm just working off of my laptop.

        THE COURT:  Can you show him how to do it?

    (Deputy clerk assists.)

DESCAMP - DIRECT

MR. BALLOU:  Thank you.

BY MR. BALLOU:

Q.   I'm pulling up what's been marked as Government's Exhibit 404.  I'm going to play beginning at 31:50.  31:53.  We'll just play for a few seconds.

(Video played.)

Where was this video taken?

A.   Center of the scaffolding.  Center area of the scaffolding.

Q.   Where were you at this time?

A.   Right here, directly in the middle.

Q.   Can you circle yourself?

A.   Sure.  This guy.

MR. BALLOU:  Government moves to admit Exhibit 404.

MR. SHIPLEY:  No objection.

THE COURT:  Without objection, 404 is admitted.

(Government Exhibit No. 404 received into evidence.)

BY MR. BALLOU:

Q.   I'm going to play until 32:35.

(Video played.)

I'm going to stop just very briefly at 32:18 and I'll circle here if I can do it.  Do you see this man I just circled?

A.   I do.

Q.    I know it's a little grainy, but can you just generally describe what you're seeing?

A.    White male, looks like orange sunglasses and something over his head.

Q.    Okay.  Keep your eye on him.  We'll keep moving forward.

(Video played.)

Okay.  I'm circling him again.  Do you see him again?

A.    I do.

Q.    Okay, great.  I'm going to play until 32:50.  And as we're watching, please follow the bike rack if you can see it here.

(Video played.)

Stopping at 32:51.  What are the protesters doing with the bike rack?

A.    Bringing it to the front, with us.

Q.    Sorry, I didn't mean to interrupt you.  Do you remember what they used that bike rack for?

A.    Not off the top of my head.

Q.    Okay.  Do you remember -- you described a couple of instances here.  What are some of the other instances when they used bike racks at this point?

A.    They were either like jousting at us with it to try to push us out of the way or using it like a gate to force us in another direction.

Q.    I'm going to advance to 33:12, and we'll play until

33:31.

(Video played.)

Okay.  Can you see the person I've circled?

A.   I can.

Q.   Can you just describe him very briefly?

A.   There's a couple faces in there.

Q.   Let me try to advance a few frames.  Right here.

A.   Okay.  I see the blue hoodie.

Q.   What does he appear to be doing as I advance frame by frame?

A.   They're tearing that tarp away.

Q.   I'm going to advance to 34:03.

(Video played.)

Let's pause for a moment at 33:54.  Can you see yourself here?

A.   I can.

Q.   Can you circle yourself?

A.   Yeah.

(Witness complies.)

Q.   Great.  Thank you.  I'll clear this.

(Video played.)

Okay.  And can you see the man I've circled there?

A.   In the blue hoodie, yeah.

Q.   What does he appear to be doing?

A.   They're still tearing away at the tarp there.

Q.    Advance to 34:14.

      (Video played.)

      We'll advance frame by frame.  Do you see the man in blue?

A.    I saw him, yes.

Q.    What was he doing?

A.    He continued to cut the tarp all the way to the corner.

Q.    I'm pulling up what's been marked as Government Exhibit 1003.  This is a slightly different angle.  Where was this video taken?

A.    It's the Senate side steps of the Capitol on the west front.

Q.    Can you just situate us, where does this sit in relation to the previous videos we've been looking at?

A.    The center scaffolding videos we were watching is slightly to the left of the American flag in the top corner there, and the corner of the scaffolding would be to the right of the center step -- the center walkway video that we were watching.

Q.    So many of the previous videos that we've been looking at would be inside the scaffolding that we're looking at now?

A.    Correct.

      MR. BALLOU:  Government moves to admit 1003.

      MR. SHIPLEY:  No objection.

      THE COURT:  1003 is admitted.

(Government Exhibit No. 1003

received into evidence.)

BY MR. BALLOU:

Q.   I'm going to play until 8 seconds here, and I'm going to ask you to focus on this circled area.

(Video played.)

What is the man circled in yellow doing?

A.   He's coming out of the tarp.

Q.   I'm advancing to 22 seconds.

Okay.  I can zoom in if you want, but can you describe what he looks like from here?

A.   Sure.  Blue hoodie, white male, orange glasses, with a hat on.

MR. SHIPLEY:  Your Honor, we're willing to concede that all these identifications of the person in the blue hoodie with the sunglasses is Mr. Bozell.  We don't need to go through that every time.

THE COURT:  All right.  That might make things easier for the government.  Go ahead.

MR. BALLOU:  Thank you, Mr. Shipley.  And you'll be pleased to know this is actually the last video for this witness.

BY MR. BALLOU:

Q.   Advancing to 50 seconds.  And if it's helpful, I may just zoom in here.

(Video played.)

What is the man in blue doing here?

A.   I see him there on the side of the flower pot.  Right now it looks like he's just looking around.

Q.   I'm going to advance a few seconds to 1:40.

Stopping now.  What is he doing now?

A.   Looks like he's waving people up or waving at someone.

Q.   I'm going to advance until 2:20.

Stopping at 2:30, what is he doing here?

A.   He was talking to the officers and now looks like he's talking to somebody next to him.

Q.   Okay.  I'm stopping at 2:45 and I'm going to ask you to pay close attention to what happens next.

(Video played.)

Stopping at 2:50.  What just happened here?

A.   They ended up breaching the landing area.

Q.   And what are the people behind him doing?

A.   They're all just following along to go up to the Upper West Terrace.

Q.   Where do these steps lead?

A.   The Upper West Terrace of the Capitol.

        MR. BALLOU:  One moment, Your Honor.

BY MR. BALLOU:

Q.   Lastly, how did your day end on January 6?

A.   How did the day end?

DESCAMP - DIRECT

Q.   When did it end, I should ask?

A.   I didn't get home until about four o'clock in the morning, but I would say around eight o'clock-ish we had people cleared out of the building.

Q.   At this time when you were at the mezzanine, did you at all fear for your safety?

A.   At that time, no.  There was just a stunned recovery time at the mezzanine after it was over.

Q.   And then what happened?

A.   After that, everyone was gone.  So that was when we were getting debriefed and things of that nature.  We have to gather all of our equipment and pack it up for the day.

Q.   Great.

    MR. BALLOU:  No further questions, Your Honor.

    THE COURT:  Mr. Shipley.

                    CROSS-EXAMINATION

BY MR. SHIPLEY:

Q.   Sergeant, correct?

A.   Yes, sir.

Q.   Good morning, Sergeant.  Thank you for coming.

A.   Good morning.

Q.   You began your testimony by describing yourself as a member of the less lethal team.

A.   Correct.

Q.   That's a reference to the type of munitions that your

unit uses?

A.    Correct.

Q.    And you're actually specialized in that respect.  Right?

A.    Correct.

Q.    In fact, you're a firearms instructor now so you train not only in use of firearms but also less lethal munitions.

A.    Yes, sir.

Q.    During this sequence of events that you've testified about where we've seen these videos, you were employing repeatedly a less lethal type of device, right?

A.    I had all different types of less lethal devices on me at the time, yes.

Q.    But consistently you were using the 303, right?

A.    The FN 303, yeah.

Q.    Describe that.

A.    That is basically a high-powered -- well, pepper ball is a paintball.  So it's the lowest level of less lethal.  There is no real levels, but it is the least pain compliance version of less lethal.  The FN 303 has a little more horsepower to it so it tends to cause a little more pain compliance.

Q.    Okay.  Pain compliance.

A.    Correct.

Q.    And you were employing it for dual purposes, to deliver the pepper spray munition, right?

A.    Correct.

Q.   Upon impact it breaks like a paintball.  But also at a high end of velocity that you don't want to get hit with it because it hurts.

A.   Correct.

Q.   But sometimes it depends on what the person might be wearing.  Right?

A.   Correct.

Q.   And you testified in the trial involving a defendant named Guy Reffitt that you employed that on him there on the stairs a few times, didn't seem to have much effect, and you thought he was wearing some kind of padding.

A.   Yes, sir.

Q.   I think you also testified that you were pretty sure that you hit pretty much everything you shot at that day.

A.   Yes, sir.

Q.   You went through five magazines.

A.   About, yes.

Q.   How many rounds in a magazine?

A.   There's like 10 rounds per magazine.

Q.   Possible that you missed?

A.   Sure.  Anything's possible.

Q.   And you weren't the only one employing that particular device, right?

A.   Correct.

Q.   And so it's likely that people who weren't -- I think you

said in earlier testimony that you were using that on anybody that you saw actively engaged with an officer.

A.   Correct.

Q.   You weren't just using it indiscriminately, right?

A.   Correct.

Q.   But if you missed, you could conceivably impact somebody who wasn't doing anything.

A.   It is possible, yes.

Q.   Now, you said when you moved from the east side to the west side, that you were stunned by what you saw?

A.   Correct.

Q.   Would it be fair to say you were stunned in two respects?

It would be fair to say you were stunned by a couple of things.  This was not the first protest you'd seen, right?

A.   Correct.

Q.   But it was the first protest where you saw hand-to-hand combat, for lack of a better description.

A.   Fisticuffs.  Correct.

Q.   But also just the sheer size of the crowd when you moved from east to west shocked you, didn't it?

A.   Yes.

Q.   On the east side there were a couple thousand people maybe?

A.   Yeah, at the time, yeah.  It was still the beginning, yeah.

Q.   But when you got to the west side you had an elevated position.  Right?

A.   Yes, sir.

Q.   So you could see out over the crowd.

A.   Yes.

Q.   And there were tens of thousands of people on the west --

A.   Oh, yes.

Q.   Now, you testified to what you saw rioters doing, and you identified Mr. Bozell at various times --

A.   Mm-hmm.

Q.   -- in pictures.  And that was sort of the purpose of the exercise.  Who's that person?  He's in a blue hoodie, wearing a -- it's Mr. Bozell.  So I'm just going to refer to that individual that you identified as Mr. Bozell.

A.   Okay.

Q.   You did see and you identified in a video Mr. Bozell pulling on the tarp at one place?

A.   Yes, sir.

Q.   You didn't see Mr. Bozell cutting a tarp, right?  You didn't see him using a knife --

A.   I couldn't see him cutting it, no.

Q.   You didn't hear, at least you can't testify here today that you heard anything in particular that Mr. Bozell was saying, right?

A.   No.

Q.   You just heard the crowd?

A.   Just what the crowd was saying.

Q.   We spent an hour with you or thereabouts on direct.  You didn't say that Mr. Bozell ever employed the bike rack in any particular fashion aggressively towards the police.  Right?

A.   No, sir.

Q.   And you didn't say that Mr. Bozell was pulling the bike rack away from the officers, as many others were doing.  Correct?

A.   Correct.

Q.   And then even at the top of the stairs there, when there's -- I think the first time we watched the video it said 2:07 and 30 seconds.  And he's sort of just milling around there talking to the officers in front of him, right?

A.   Mm-hmm.

Q.   Then for some period of time he turns, he's got his back to the officers and he's looking out at the crowd?

A.   Yeah.

Q.   And it's not until 2:09:45, so we're two minutes and 15 seconds later, that there's -- the crowd rushed past the officers.  Right?

A.   Yes.

Q.   And you identified Mr. Bozell right there, you know, near the front of the group that pushed through the line.

A.   Correct.

Q. And I think -- we could look at the video again, but you've probably seen that many times. There's like five or six officers in the way. Right?

A. Yes.

Q. Two or three of them just -- they knew that was a tide that they couldn't hold back and they just turned and went the other way. Right?

A. Mm-hmm.

Q. And a couple stepped to the sides.

A. Okay.

Q. So the crowd pretty much had free run up those steps once the officers exercised --

MR. BALLOU: Your Honor, objection. This is bordering on speculation now.

MR. SHIPLEY: He testified to the --

THE COURT: Just a second. Overruled. You may proceed.

BY MR. SHIPLEY:

Q. So once the crowd sort of had the stairway, the officers exercised discretion and stood aside?

A. Once the initial push made it through the officers, they turned around and tried to regroup at the top of the steps, yes.

Q. There's no officers over -- getting knocked down and run over there, right?

A.    I didn't see it in the video, but -- I don't know.

Q.    But you were there.  Right?

A.    I wasn't at that particular location, no.

Q.    Okay.  You didn't see the aftermath where any officers were being treated for having gotten knocked down or run over there, right?

A.    No.

Q.    I'm talking about that specific -- the crowd pauses there for a long period of time, then all the sudden everybody comes forward.

A.    Yes.

Q.    And it's not just -- we can watch it again real quick if you want to see it.  I'm not going to deprive you of it. We can have them brought up.  But it's not just the two people in the front of the crowd that suddenly push through and nobody follows, is it?  It's everybody on the stairwell kind of pushes forward at the same time, and that's what causes the officers to have to fall back?

A.    Okay.  I feel that -- yes, that potentially could have happened.

Q.    Okay.

        MR. SHIPLEY:  Thank you, Your Honor.

        THE COURT:  Redirect.

        MR. BALLOU:  Just to clarify one thing, Your Honor.

    I'm taking a gamble by trying to present once again.

Your Honor, can you see the video?

THE COURT:  It appears to be up there, yeah.

REDIRECT EXAMINATION

BY MR. BALLOU:

Q.    Sergeant, I just want to play you just one moment just to clarify something.  This is Exhibit 1003, starting at 2:38.

(Video played.)

Okay.  You see Bozell moving forward at that moment. Right?

A.    I do.

Q.    And we can go back.  Has any police officer moved out of the way of Bozell's path?

A.    Not that -- they eventually turn to start running up the steps, yes, but they are getting -- they're pushed backwards.

Q.    So they did not move to the side to make way for Mr. Bozell and the other protesters.  Right?

A.    Correct.  They stayed right in the same spot.

MR. BALLOU:  No further questions, Your Honor.

THE COURT:  All right.  Why don't we just, for ease -- you may step down.  Thank you very much, Sergeant.

(Witness steps down.)

For ease of scheduling, why don't we take our morning break and we'll resume at 11:15 with your next witness.  Thank you.

(Recess from 11:00 a.m. to 11:27 a.m.)

THE COURT:  All right.

MS. AKERS:  The government calls Officer Bradley Murray.

BRADLEY MURRAY, WITNESS FOR THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MS. AKERS:

Q.   Thank you for being here.  Can you please state and spell your name for the court reporter?

A.   Bradley, B-R-A-D-L-E-Y.  Murray, M-U-R-R-A-Y.

Q.   Officer Murray, are you employed?

A.   Yes.

Q.   Where do you work?

A.   The United States Capitol Police.

Q.   What is your position at the United States Capitol Police?

A.   Officer.

Q.   How long have you worked for the Capitol Police?

A.   Just over 20 years.  I began my career in April 2003.

Q.   And were you working for the United States Capitol Police on January 6, 2021?

A.   I was.

Q.   What was your position then?

A.   On that day I was assigned to the north barricade of the United States Capitol.

Q.   And what uniform were you wearing on January 6?

A.   It was a department-issued pants, department-issued

cruiser jacket, department-issued ball cap and a personal winter fleece gaiter.

Q.   Like around your neck area?

A.   And face, correct.

Q.   And early on in the day you said you were stationed at the north barricade.  Is that correct?

A.   That's correct.

Q.   Can you tell us just briefly your experience early on in the day?

A.   Yes.  Early on in the day at the north barricade, it is located at 11 Constitution Avenue Northeast and it's in the area of just south of Delaware and Constitution Avenue in the Northeast.  That's where the barricade is located. We're trying to run our normal day-to-day operations of allowing staff and members to access those areas.

And I remember one of the first issues we were having was with the crowds and trying to keep the crowds off of our deployable barriers.  So those barriers are deployed to prevent unauthorized vehicles from entering the perimeter.

And I recall just trying to keep the crowds from walking on those barriers so we could deploy them to prevent any type of accidents.  At one point I remember placing caution tape up to prevent crowds from walking on there.  And at one point the caution tape was removed.  I don't know if it was cut, torn down, anything like that.

But when I was trying to close that area to prevent individuals from walking into our area and our deployable barriers, I remember a confrontation I had with some individuals, and they questioned the authority of which I was able to close that sidewalk.  And they asked where in the Constitution did I have the authority to close that sidewalk.  And then they questioned who my oath was to and they questioned my oath.

And I explained to them that in regards to the Capitol grounds regulations, that authority is given to us from Congress and the Capitol Police Board.  So that's how we received that authority to close down those areas, to close down sidewalks, for the protection of the people and to keep the flow of traffic.

Q.   So, Officer Murray, after those interactions on the north barricade, did there come a point on January 6 where you actually made it to the west side of the building?

A.    That's correct.  Once additional units were called, the officer I was holding the line down with, he advised me to go ahead and respond to the west front and he would hold down the offense line on the northwest drive.

Q.    To your knowledge why were you called to respond to the west front?

A.    It's from my understanding there was a breach on the west front of the Capitol for the perimeter line.

Q.   When you went from the north side of the Capitol and walked to the west front, where did you go?

A.   So I was stationed in the area of the top northwest drive.  I responded south to the area of the north door of the Capitol, and then I responded west across the North Terrace and then south across the West Terrace.

Q.   And so is it fair to say when you ended up on the west side you were on the Upper West Terrace of the Capitol building?

A.   That's correct.

Q.   And more on the north side than the south side?

A.   That's correct.

Q.   All right.  Were you at -- were there any staircases around where you were standing?

A.   The staircase would have been, if I was facing west, the staircase would have been in front of me.

Q.   All right.  And when you got to the west side and you were at the top of the staircase there, what did you see in front of you, looking west?

A.   When I went out onto the stage area, I could see the crowd had entered into the west front perimeter area.

Q.   And had the crowd entered the Upper West Terrace by the time you got there?

A.   Not the Upper West Terrace.

Q.   When you arrived at the top of those stairs -- I'm going

to refer to them as the northwest stairs.  Is that what you would call them?

A.    That's fine, yes.

Q.    When you got to the top of the northwest stairs, what was your duty or job at that point?

A.    When I arrived at the top of the staircase, I came into contact with Lieutenant Pollack, who was my lieutenant at the time.  He told me to hold down that area at the top of the staircase to prevent people from further getting closer to the building.

Q.    And how did you do that duty?  What did you do to hold down the area?

A.    One of the things I did, the area was an active construction site.  There was a lot of debris in the area, including like hammers, tool belts.  Also, there was a line of bike racks at the top of the staircase and I made the decision to interlock all of those bike racks.  That way it could be better defended.

Q.    You mentioned there was a lot of construction debris.  Did you do anything with that construction debris?

A.    Yes.  We made an attempt to hide that debris, so it could not be used against us.

Q.    And then you deployed the bike racks at the top of the stairs.  Correct?

A.    They were interlocked at that time, yes.

Q.    Did you remain at the top of the stairs behind the bike rack?

A.    Yes.

Q.    Did there come a time when you actually descended down the stairs to sort of the middle of the northwest stairs?

A.    That's correct.

Q.    And why did you do that?

A.    The first time was a call was made for water to help decon officers who were affected by chemical irritants.  I remember at one point taking a case of that water down to the area of what was considered the stage.  And then I eventually responded down to the middle of the Lower West Terrace at one point.

Q.    I'm plugging in my computer and pulling up some exhibits. Can you let me know if you can see on your screen a 3D model of the Capitol building?

A.    That's correct.

Q.    And can you identify for the Court -- you can draw a circle -- approximately what area you set up that bike rack?

       (Witness complies.)

       Okay.  So you drew a circle at the top of the northwest stairs right above the number 3.  Correct?

A.    That's correct.

Q.    All right.  And at some point you said you'd sort of descended down.  Can you indicate on the screen where

approximately you descended down to?

A.   For the first time for the water?

Q.   Sure.

A.   It would have been in this area here.

Q.   So you went over to the middle of the Capitol building?

A.   Of the stage area.

Q.   Did you later descend down the northwest stairs?

A.   Yes, I did.

Q.   And where approximately did you go?

A.   It would have been in the area of No. 3.

Q.   I'm going to pull up Government Exhibit 1004.

Officer, is this CCTV footage from January 6 at approximately 2:09 p.m.?

A.   Yes.

Q.   And --

THE COURT:   Both?

MS. AKERS:   Correct.

BY MS. AKERS:

Q.   And are these different angles of the same general area from January 6, 2021?

A.   That is correct.

Q.   Can you identify yourself in, first, how about the left-hand video?

(Witness complies.)

And then can you identify yourself in the right-hand

video?

(Witness complies.)

You drew two circles around a person in a sort of black bomber jacket with a black gaiter on and a baseball cap.  Is that correct?

A.    That's correct.

MS. AKERS:  Your Honor, the government moves to admit Exhibit 1004.

MR. SHIPLEY:  No objection.

THE COURT:  1004 is admitted.

(Government Exhibit No. 1004 received into evidence.)

BY MS. AKERS:

Q.    At this point, Officer, is it fair to say the crowd was in front of you?

A.    That is correct.

Q.    And where in the northwest stairs are you at this point?

A.    I would say in the middle.  That was a landing between two staircases.

Q.    I'm going to play from 2 seconds to 15 seconds.

(Video played.)

All right.  Stopping at 15 seconds, at this point are you in an officer line?

A.    In the rear, yes.

Q.    What was you and your fellow officers' objective at this

time and place?

A.    To try to hold the crowd back at that location.

Q.    Why was that important to the officers?

A.    To prevent them from entering the -- gaining access to the actual Capitol building itself.

Q.    And based on your understanding from working on that day, was there a proceeding going on inside the Capitol building?

A.    That's correct.

Q.    Did you perceive this crowd that was advancing up the stairs to pose a threat to you and your fellow officers?

A.    That's correct.

Q.    Can you explain why?

A.    If you look at my photo, to my right down below in the area where you see like the trees, we were taking debris from individuals in that location.  I remember being struck at least two times by different pieces of debris, one being a large bolt.  And then I recall other officers saying that they were struck with items such as batteries.  And at one point somebody did throw a traffic cone into that location.

Q.    And when you were on this landing around 2:09 p.m., what was the demeanor of the crowd like that was facing towards you?

A.    It seems like they wanted to progress up the stairs.

Q.    Would you characterize the crowd in any manner as being peaceful?

A.   No.

Q.   Were they being compliant with you and your fellow officers' orders?

A.   It did not seem so.

Q.   I'm going to skip ahead to 20 seconds and play until 24 seconds.  I'm going to have you just pay attention to the white area -- I'm drawing a circle on the left-hand side of the screen -- the white area above the officers' heads.  All right?  (Video played.)

And did you see anything happen on that white area that I circled?

A.   Yes.  An object came from a location, and it looked like it struck the wall.

Q.   I'm going to circle what appears -- I'm on the wrong screen.  I'm going to circle an object in the top right-hand corner of the left-hand side of the screen.  Is that the object you're referring to?

A.   That is correct.

Q.   And previously you testified that you were hit with several objects.  Where approximately were the objects being deployed from?

A.   It appeared that they were coming from down below to my right, in the area where you see the trees.

Q.   And you testified that you were actually hit with several objects.  Correct?

A.    That's correct.

Q.    When you had objects coming from the side at your right, were you able to defend yourself from those objects given the crowd that was in front of you?

A.    No.

Q.    Why not?

A.    Because I realized we -- you could use the term we were outflanked at that time.  We had objects coming in from the right and then the crowd to our front.  And also, one of my fears was the staircase behind us.  If I could reflect back on another civil disturbance type environment in which we were holding an intersection and there was an officer in front of the curb line, and he went to step back and tripped back on that curb, and I remember telling him, you know, take the higher ground, step up on that sidewalk, don't let that curb be an obstacle, a danger to yourself, like we need to take a higher ground.

And that was my fear there too, with the staircase to our rear.  If we were pushed back, that would have been a tripping hazard and we could have been overrun.

Q.    And you mean pushed back by whom?

A.    The crowd.

Q.    Were you -- did the crowd in front of you impede your ability to defend yourself from the objects coming from the right?

A.    Because our attention was focused on them.

Q.    So is that a yes?

A.    Yes.

Q.    I'm going to play now until 34 seconds.

      (Video played.)

      Can you identify yourself -- let's just do on the left-hand side of the screen because it's a little clearer.

A.    That's correct.

Q.    You drew a circle around yourself, and it looks like you're holding something.  Are you?

A.    I did.  One of my fears at that point was the amount of debris that we were being struck with could be used again.  I was trying to utilize, if you see right here is a flower pot, I remember throwing debris in there just to try to get it away from the crowd, say, if we could remove this from the environment, then it can't be used against us again.  I did pick up that cylinder.  I'm not able to identify what that cylinder was, but my purpose in picking that cylinder up was to prevent it from being used as a weapon against us.

Q.    And at this time -- we're about 34 seconds into the clip -- is the demeanor of the crowd in front of you the same as you previously described while you're getting stuff thrown at you?

A.    That's correct.

Q.    How would you characterize them?

A.    As if they wanted to ascend up the staircase.

Q.    I'm going to play now from 34 seconds to 45 seconds.

(Video played.)

Officer, I stopped at 46 seconds on accident.  What just happened there?

A.    A traffic cone was thrown from a location in the direction of where we were posted.

Q.    And now I'm going to play again, starting at 46 seconds.

(Video played.)

I stopped at 52 seconds.  Officer, what just happened?

A.    The crowd broke through our line and progressed up the steps.

Q.    When the crowd, as you characterize it, broke through the line, did you and your fellow officers maintain your ground and hold your police line?

A.    We did not.

Q.    Why not?

A.    We were outnumbered.

Q.    And did you -- why did being outnumbered lead you to turn in the direction of upward the stairs rather than staying, facing the rioters?

A.    Out of fear that we would have been trampled on the staircase.

Q.    I'm now going to pull up Government Exhibit 1000.

Officer, is Government Exhibit 1000 on the left-hand side

of the screen CCTV footage we reviewed in preparation for your testimony?

A.    Yes.

Q.    And on the right-hand side of the screen, is this footage filmed by one of the rioters occurring at about the same time as the CCTV footage on the left?

A.    Yes.

Q.    And are you able to identify yourself in the CCTV footage on the left?

A.    Yes.

MS. AKERS:  The government moves to admit Exhibit 1000.

MR. SHIPLEY:  No objection.  Could we ask the witness to actually identify himself?

MS. AKERS:  Sure.

BY MS. AKERS:

Q.    Can you please circle yourself, Officer?

A.    Yes.

(Witness complies.)

MR. SHIPLEY:  No objection.  I appreciate the officer clarifying.

THE COURT:  Without objection, 1000 is admitted.

(Government Exhibit No. 1000 received into evidence.)

MS. AKERS:  Thank you, Your Honor.

BY MS. AKERS:

Q.   And did you circle yourself holding that canister that you previously testified to?

A.   I did.

Q.   And can you please state the time as indicated on the CCTV footage?

A.   2:09:34 p.m.

Q.   I'm going to play this exhibit.

      (Video played.)

      All right.  I'm stopping at 48 seconds.  Officer, can you explain to the Court what just happened in this video footage?

A.   The crowd broke through our line and we ascended up the staircase.

Q.   In your experience, when you say the crowd broke through the line, did they move or act with force?

A.   Yes.

Q.   Why do you say that?

A.   Because of the manner at which they were moving.  We did have officers there in front of my location trying to hold that line.

Q.   And when you weren't able to hold the line, what did you then do?

A.   I ascended up the staircase.  I thought that would be a better location for us to hold the line because I had interlocked those barricades and removed debris from the area

prior to descending down the steps.

Q.   When you turned and ascended the steps, what manner were you moving in?

A.   I was running.

Q.   And why were you running?

A.   Out of fear of getting trampled.

Q.   I'm going to pull this back to 7 seconds.  And on the right-hand side of the screen do you see an arrow pointing to an object?

A.   I do.

Q.   Or a person, I suppose.  And do you see, like, sort of a navy blue in color item that the red arrow's pointing to?

A.   I do.

     (Video played.)

Q.   At 18 seconds do you see the red arrow on the left-hand side of the screen?

A.   I do.

Q.   I'm going to put a circle around a person who's wearing maybe a royal blue jacket.  Do you know who that person is?

A.   That is one of my coworkers.

Q.   What is his name?

A.   Officer Tom McMahon.

Q.   We just watched this video with some audio in it.  What did you hear here the crowd saying as they barrelled through the police line?

MR. SHIPLEY:  I'm going to object.  The audio speaks for itself.  If the witness has an independent recollection, he can testify to that, but I don't think he can just repeat what's on the audio.

THE COURT:  In these cases without a jury, we typically are allowing the witness to repeat, because sometimes I don't hear as clearly as others do.  So whether you remember it from the moment or from hearing the video that you're watching that you were a participant in, you can go ahead and testify to what you hear.

THE WITNESS:  From the video it sounded as if the individual is saying "let's go."

BY MS. AKERS:

Q.   Let me pull this back to approximately two seconds and play one more time here.

(Video played.)

Did you hear in the audio -- I know it's sort of faint in the courtroom -- any references to pushing?

A.   Not of my -- I just remember my coworker saying we need to move.  Officer McMahon.  We need to move.

Q.   Would you agree with the characterization that the line was pushing the officer line as they barrelled forward?

MR. SHIPLEY:  Objection.  Leading.

THE COURT:  Sustained.  Try to do it without leading.

MS. AKERS:  Sure.  I'll reask you the question.

BY MS. AKERS:

Q.   How would you characterize the crowd's movement as they progressed towards the officer line?

A.   As if they wanted to make it to the top of the staircase.

Q.   And did the crowd at this point as they wanted to make it to the top of the staircase, did they interfere and impede with your ability to do your job?

A.   Yes.

Q.   I'm going to pull up Government Exhibit 1005.  Is Government Exhibit 1005 on the right-hand side at this point a CCTV footage?

A.   On my screen I'm only seeing a right side.  Okay.  Yes.

Q.   Yes.  And then later in the video, which -- did you watch this video in preparation for your testimony?

A.   Yes.

Q.   And later in the video does third-party footage appear on the left-hand side of the screen?

A.   Yes.

Q.   And based on your review of the video and your experience at this time -- excuse me -- on January 6, were these videos taken at approximately the same time period?

A.   Yes.

        MS. AKERS:  The government moves to admit Exhibit 1005.

        MR. SHIPLEY:  No objection.

        THE COURT:  Without objection, 1005 is admitted.

(Government Exhibit No. 1005

received into evidence.)

MS. AKERS:  I'm going to play Government Exhibit 1005.

(Video played.)

BY MS. AKERS:

Q.   Stopping at 43 seconds.

Officer, were you in this crowd that was ascending up the stairs?

A.   That is correct.

Q.   And can you tell me what that was like as you were running up the stairs?

A.   I was fearful of being trampled.

Q.   And why were you fearful of being trampled?

A.   Because the crowd was ascending behind us.

Q.   I'm going to pull up Government Exhibit 1002, the last one here.  And is Government Exhibit 1002 video footage that was taken around the same time that you reviewed in preparation for your testimony?

A.   Yes.

Q.   Does it accurately depict what your experience was like on January 6?

A.   Yes.

MS. AKERS:  The government moves to admit Exhibit 1002.

THE COURT:  Just a second.  Did you say government footage?

MS. AKERS:  No.  I said -- I don't know what I said, but I didn't mean government footage.  I think I said video footage, or intended to.

THE COURT:  Any objection, 1002?

MR. SHIPLEY:  No objection.

THE COURT:  1002 is admitted.

(Government Exhibit No. 1002

received into evidence.)

BY MS. AKERS:

Q.   I'm going to play from zero seconds to 43 seconds.

(Video played.)

I stopped at 43 seconds.  Officer Murray, when the crowd reached the top of the stairs, did they slow down their run?

A.   They did not.

Q.   Well, at some point --

A.   Yes.

Q.   Did you say yes?  I'm sorry.

A.   Yes.  When they reached the bike racks.

Q.   And so was that the same bike rack where you had previously set up?

A.   That is correct.

Q.   When you reached the top of the stairs, what did you do?

A.   As I was ascending up the staircase, I went to my left, or the north, to try to secure that side of the bike rack to prevent people -- it was my intention to try to use the

geography of the Capitol, for us to use that as a defensive posture to help hold the crowd back.

Q.   And were you and your fellow officers successful at the top of the stairs bike rack in keeping the crowd on the stairs?

A.   We were not.

Q.   Can you explain what happened?

A.   From my experience, if you see where the yellow circle is, I would have been to the left of that location on the end. I remember trying to hold that bike rack down as hard as I could, but an individual who I was not able to identify sprayed me in the eyes with some type of chemical irritant and I lost control of the bike racks.

Q.   And when you lost control of the bike racks did your fellow officers on the line also lose control of the bike racks?

A.   That's correct.

Q.   Did the -- how was the demeanor of the crowd in front of you at the time depicted in this video?

A.   Aggressive.

Q.   And when the bike racks you said were removed, who were they actually removed by?

A.   They were pushed eastward by the crowd.

Q.   Would you characterize the pushing as forceful?

A.   Yes.

Q.   At this point, were you still in fear for your safety at the top of the stairs?

A.   Yes.  After being sprayed with the chemical irritant.

Q.   And did the spray and having to defend behind the bike racks impede your ability to do your job of protecting the Capitol building?

A.   That's correct.

Q.   How so?

A.   We were not able to hold that line.

Q.   After you were sprayed and the line broke there, then what did you do?

A.   I started to proceed north and then east across the terrace because it was my fear, like, of getting, you could say swarmed by the crowd.  Like, I wanted to try to keep the crowd somewhat in front of me, didn't want to have people behind me as well.  So I was trying to react to the spray.

Q.   And after the crowd broke through that line, what did a lot of the crowd do then?

A.   It was my understanding they proceeded to a window of the Capitol that was broken out.

     MS. AKERS:  No further questions, Your Honor.  Thank you, Officer.

     THE COURT:  All right.  Mr. Shipley.

     MR. SHIPLEY:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SHIPLEY:

Q.    Good morning, Officer.

You went up the stairs, fairly, out of fear of being trampled by the crowd that was behind you.

A.    In front of me.

Q.    But you also testified that you had recognized that was sort of a tactically disadvantaged location where you were at. Right?

A.    That is correct.

Q.    You had a large crowd in front of you, probably there wasn't a good place to take up a tactical position.  But where you were at, you had the crowd down below throwing things and the group in front of you that was occupying your attention?

A.    Uh-huh.

Q.    And stairs behind you is not something you want if you're trying to back up.

A.    That's correct.

Q.    Now, would it be fair to say that as the officers turned to go up the stairs to escape -- not pejoratively, but just to escape the threat of the crowd behind them, that that same threat probably existed for any member of the crowd that tried to stop?  Right?

A.    I don't understand your question.

Q.    Well, if you're trying to get away for fear of being

trampled by an advancing crowd, if somebody in the crowd stopped, they're going to get trampled.

A.    Possibly, yes.

Q.    And I don't think you would -- I don't take it from your testimony that you had the thought that the crowd was trying to attack the officers.  They were just trying to get past the line that you had formed.  Right?

A.    I don't know, because we were being hit with the debris from down below.

Q.    Fair enough.  That's kind of indirect.  The people down below can't really see what they're throwing at.  They're just throwing stuff out there, right?

A.    That I don't know.  I can't --

Q.    But the crowd on the stairs can see the officers in front of them, right?

A.    The crowd could see the officers.  That's correct.

Q.    You and the four or five others that were exposed right there in front of them, they could see you, and they began to advance forward, they can see you there, and you and three or four others -- I think one kind of stood to the side and let the crowd pass, put his back to the tarp.

A.    That I don't recall.

Q.    We can watch it again.  And then, I think I counted three of you actually just up the stairs ahead of the crowd.  But the -- none of you were tackled on the way, right?  Nobody

held you down and pummelled you?

A.   I can only speak for myself, and I was not.

Q.   And you didn't see any other officer go down and get set upon by some protesters and get beaten, right?

A.   At that location, I don't recall.

Q.   When you got to the top of the stairs the crowd began to -- after they bypassed the bike racks, they began to disperse, they went lots of different directions, right?

A.   I believe a majority of the crowd went to the area of the windows.  But like I said, I was injured at that time.

Q.   And when they get to the top of the stairs and the bike rack stops them, but then they bypass the bike rack, if they run straight, they are just going to sort of run parallel to the building until they get to the north end.  Right?

A.   That's not correct.  If they proceeded east up the staircase, the way the Capitol is designed, they would go towards the Senate Wing.  So you would have to make a left or to the north and turn and then right or east to exit the --

Q.   My error.  That stairway runs east and west.  It's not running north and south.  I sort of had it in my head it was running north and south.

A.   That's correct.

Q.   But it runs east and west to the top, and then if they go left they're going to run parallel to the building?

A.   If they went left, that's correct.

MURRAY - CROSS

Q.   Towards the north?

A.   Towards the north.

Q.   And then go straight, you're just going to run into the building?

A.   No.  If they made a left and went straight after making that left they would run to the end of the terrace.

Q.   Okay.  Now, but at some point while you were trying to man the bike racks, for some short period of time while the bike racks held, you were sprayed in the face?

A.   That's correct.

Q.   You don't think it was pepper spray, right?  It was something else?

A.   I do not know what it was.

Q.   Well, you've been sprayed with pepper spray, right?

A.   That's correct.

Q.   So you know sort of what the sensation is.  You have a recollection that that was it or it was something else?  Not that it really matters.

A.   I don't recall.

Q.   But you were incapacitated, by whatever it was?

A.   That's correct.

Q.   And you had to retreat from the bike rack?

A.   Yes.

Q.   Seek treatment?

A.   Later that evening, I did, from a medical professional,

but we were using bottles of water to self-decontaminate.

Q.   Okay.  At least in the moments after it happened, you sought some kind of treatment from fellow officers to wash it off.  So you didn't see what happened at least immediately after the crowd bypassed the bike racks?

A.   I was advised by an officer who was at that location that individuals were breaking through the windows.

Q.   You testified that you could hear on the audio the words "let's go."  Right?

A.   I did read that from this hearing, yes.

Q.   Even watching the audio, you can't attribute those words to any particular person, right?  You can't see who the speaker is?

A.   I would have to watch the video again.

Q.   Well, let's say -- you didn't testify on direct examination to who the speaker was, right?  Just that you could hear the words.

A.   That's correct.

Q.   Now, at least as to that five or six officers there at the top, sort of all congregated together, there was a period of time before the crowd -- I think it was at -- I wrote it down -- 2:08:43 or 45 is about when the crowd pushed through there.  Five or six officers.  You with a helmet, another officer with a helmet.

A.   That is not correct.  I did not have a helmet.  I was

wearing a department-issued ball cap and fleece gaiter.

Q.   Okay.  I thought you circled yourself -- fair enough.
Was there anybody among that group of five that was sort of
in operational command or were you all just kind of talking
to each other trying to figure out how to manage yourselves?

A.   I don't recall anybody being in like any type of
operational command.  We were just trying to hold it
ourselves.

Q.   Okay.

MR. SHIPLEY:  Can I have just a moment, Your Honor?

THE COURT:  Certainly.

(Defense conferring.)

MR. SHIPLEY:  Nothing further, Your Honor.  Thank you.

THE COURT:  Redirect, Ms. Akers?

MS. AKERS:  No, Your Honor.

THE COURT:  All right.  Thank you very much, Officer.
You may step down.

THE WITNESS:  Thank you, Your Honor.

(Witness steps down.)

THE COURT:  And let's call our next witness.

MR. BALLOU:  Your Honor, we call Officer Victor
Nichols.

THE COURT:  All right.

Good afternoon, Officer Nichols.  Please stand there to be
sworn before you take the stand.

VICTOR NICHOLS, WITNESS FOR THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. BALLOU:

Q.   Good afternoon, Officer.

A.   Good afternoon.

Q.   Can you please state and spell your name?

A.   It's Victor Alexander Nichols, Jr.  V-I-C-T-O-R, Alexander, A-L-E-X-A-N-D-E-R, Nichols, N-I-C-H-O-L-S, Junior, J-R.

Q.   Where do you work?

A.   United States Capitol Police.

Q.   And what's your title?

A.   Sergeant.

Q.   And how long have you worked there?

A.   I just started year 10 in July.

Q.   What are your current responsibilities?

A.   I'm a sergeant.  I supervise the line officers on the House Division.

Q.   And on January 6 what was your role?

        THE COURT:  January 6, 2021.

        MR. BALLOU:  Thank you for the correction, Your Honor.

BY MR. BALLOU:

Q.   January 6, 2021, what was your role?

A.   I was a sergeant that day as well.  I supervised officers who were assigned to the east front of the Capitol.

Q.   Can you describe how your morning began?

A.   My morning began -- I started around 7 a.m.  I was a admin sergeant, so I came in, prepared roll call.  We have roll call around the Rayburn building to get our guys ready for their assignment on the east front.

Q.   And what happened then?

A.   On the east front we set a police line on the east front restricting the plaza, which is the improved area by the House Egg, which is the grassy area.  We went on -- we made sure the bike rack was in place, and we went, you know, hour on, hour off in the beginning because it was relatively calm.

Q.   Tell us how your morning progressed.

A.   So after -- we got a call for everybody to come back to post, then we heard a 1033 on the west front, in front of the west front of the Capitol.  After that, I had an officer next to me, he asked me, Sarge, can we go, can we go to help?  And I told him, yes, let's go.  So I grabbed -- it was myself and I believe four other officers.  We went and we responded to the west front.

Q.   And for those of us who are uninitiated, what's a 1033?

A.   It's an officer in distress who needs -- someone needs help.

Q.   So you went to the west side of the Capitol.  And what happened then?

A.   So when we got to the west side of the Capitol, we saw a

NICHOLS - DIRECT

crowd over there. They had made it to the Lower West Terrace. We looked and we went to go respond down to assist, and pepper spray had been deployed already, and we realized us going down, we would become casualties and we would become a liability. So what we did is we created a bike rack, we put bike rack at the top of the steps to make sure no one can come up. And any people who were coming from the line, we helped decon them as they were coming up.

Q.   And what does "decon" mean?

A.   So anybody that was pepper-sprayed, we would use bottled water or whatever to get the pepper spray out of their eyes.

Q.   And where do you go after that?

A.   So after that I dealt with an arrest on the west front. There was a man who climbed scaffolding on the west front and I helped to subdue him and he was taken away. I climbed up the scaffolding where he was. What I did was, we -- I looked at the crowd to see if there was anything suspicious going on in the crowd. We did recognize someone starting to put gas masks on in the crowd and I put that on the radio.

Q.   Did you go into the building at a certain point?

A.   Yes, I did. So there was a call for us to lock down the building. When the call was made, everybody who was up on the Upper West Terrace, we went into the, I guess you'd say the Lower West Terrace door, the tunnel that, you know, that's been said. The building was locked down. That door was

locked.  And I ended up going up towards the Crypt.

Q.   I'm pulling up what's been marked as Government Exhibit 1006.  We'll play for about eight seconds.

(Video played.)

Sergeant, where was this video taken?

A.   That would be on the Upper West Terrace on the Senate side.

Q.   And very approximately, when would this video have been taken?

A.   So this video would have been taken approximately -- it would have been after I was in the building.  I don't have a time.

Q.   That's helpful enough, because it's useful for placing where we're going to go with a couple of these videos.

MR. BALLOU:  Government moves to admit Exhibit 1006.

MR. SHIPLEY:  No objection.

THE COURT:  1006 is admitted.

(Government Exhibit No. 1006 received into evidence.)

BY MR. BALLOU:

Q.   I'm going to play until 15 seconds.

(Video played.)

Can you describe the highlighted man?

A.   The highlighted man looks to have a hoodie on and -- is it a blue hoodie?  Looks like a blue hoodie and black pants?

Q.   I'm going to play until about 19 seconds.  Can you just follow --

MR. SHIPLEY:  Your Honor, we'll stipulate that that is Mr. Bozell that was highlighted there.

THE COURT:  All right.  Thank you, Mr. Shipley.

MR. BALLOU:  Thank you.

BY MR. BALLOU:

Q.   I'm just going to play from 15 to about 19 seconds, 16 seconds.

(Video played.)

Can you describe what Mr. Bozell was doing right there?

A.   It looked like he was reaching down to the ground. I don't know if he was picking up an object.

Q.   I'm going to play until 34 seconds.

(Video played.)

Do you see Mr. Bozell highlighted again?

A.   Yes.

Q.   Where is he headed?

A.   Toward the Senate Wing Door.

Q.   Play to the end.

(Video played.)

Okay.  I'm going to pull up what's been marked as Government Exhibit 1007.  Play it for about 6 seconds.

(Video played.)

Where was this video taken?

A.   Next to the Senate Wing Door, there's windows that are adjacent to it.

Q.   And I'm going to play until about 18 seconds.  It's going to highlight a section.

     (Video played.)

     I don't know if the defense will stipulate to that being Mr. Bozell in this video, so I'll just say for now, the man in blue, what was he doing there?

A.   He was hitting the window to the Senate Wing Door with an object, it looks like.

Q.   And we can play it again to count if you want, but how many times did he strike the door?

A.   I don't recall.

Q.   Let's play it again just really quickly.

     (Video played.)

     Did you get a sense of how many times he struck the door?

A.   Approximately 10 times.

Q.   What's happened to the door here?

A.   It is damaged.

Q.   Can you describe specifically what's happened?

A.   It looks like the window began to shatter.

Q.   Playing until 25 seconds.

     (Video played.)

     I know you can't read this but can you just generally describe what's on the man's hoodie here?

NICHOLS - DIRECT

A.    Looks like a symbol, looks like it has a cross on it, I believe.

Q.    Pulling up what's been marked as -- well, we admitted Government Exhibit 1007, didn't we?

THE COURT:    No.    It hasn't been admitted yet.

MR. BALLOU:    My apologies then.    Government moves to admit 1007.

MR. SHIPLEY:    No objection.    And we stipulate that is Mr. Bozell's sweatshirt.

THE COURT:    1007 is admitted without objection.    And thank you, Mr. Shipley, for your stipulation.

(Government Exhibit No. 1007 received into evidence.)

BY MR. BALLOU:

Q.    Moving along to Exhibit 407.    I'm going to start at 11:14 and just play for a few seconds.

(Video played.)

Once again, where is this video taken?

A.    It appears to be at the Senate Wing Door.

Q.    Is this approximately the same time as the previous videos?

A.    I believe so.

MR. BALLOU:    Government moves to admit Exhibit 407.

MR. SHIPLEY:    Does it run continuously to 22:38?

MR. BALLOU:    No.    It changes scenes.

MR. SHIPLEY:  Your Honor, I've looked at this and it changes scene somewhere else.  This witness has already testified that he was inside at this point, but I've let it go on.  He recognized the area.  If we need to see the rest of it to see if he recognizes that.  But...

MR. BALLOU:  Your Honor, I don't think we want to bore you with some extraneous parts of this video.  There's a short, about 45-second clip that's relevant here within the larger video.

MR. SHIPLEY:  Then I'd ask the government to clip that and make that the exhibit.  And I won't object to 407 if we clip that down to just what's relevant rather than have a 22-minute video.

THE COURT:  Well, it isn't 22 minutes -- well, I guess it is.  This is running at 11:20.

MR. SHIPLEY:  Yeah.  But at the end it runs to 22:38.

THE COURT:  So it is a 22-minute video, most of which the government is not trying to admit?

MR. BALLOU:  Most of which the government does not need, I should say.  We are trying to admit the entire exhibit.

THE COURT:  Are you able to clip it down so you only have the relevant portion?

MR. BALLOU:  Yes, we can.  I'm wondering how to do this most efficiently for the Court's and Sergeant Nichols' time.

Perhaps we could conditionally admit this exhibit on the understanding that we will clip it to just this moment?

MR. SHIPLEY:  I'll take the government at their word. If they'll clip it down to what's relevant, I don't have an objection to that.

MR. BALLOU:  On the understanding then that we will clip this video to just the portion outside --

THE COURT:  And what is it approximately in terms of the running time?

MR. BALLOU:  I think this video we plan to play about two or three minutes total.

THE COURT:  But from when to when?  From roughly 11 minutes to roughly 14 minutes?

MR. BALLOU:  Yes.  Sorry.  I should say a little over two minutes, from a little over 11 to a little over 13.

THE COURT:  With that understanding, no objection?

MR. SHIPLEY:  No objection with that understanding. Thank you, Your Honor.

THE COURT:  And with the understanding that the government will clip it to the approximately three-minute portion.

MR. BALLOU:  Thank you, Your Honor.

                              (Government Exhibit No. 407

                                received into evidence.)

BY MR. BALLOU:

Q.   Sergeant, just to confirm, this is outside the same Senate Wing area?

A.   Yes.

Q.   I'm going to play until 11:26.

     (Video played.)

     Do you see the door right here?

A.   Yes, I do.

Q.   Is it cracked at that point?

A.   No.

Q.   Moving ahead to 11:41.

     (Video played.)

     Is the window in the door now cracked?

A.   Yes.

Q.   And can you describe the man who is cracking it?

A.   It is the same gentleman that I described earlier.

Q.   Wearing the blue hoodie?

A.   Yes.

Q.   I'm advancing to 12:13.

     (Video played.)

     Stop at 12:09, actually.  Who is this officer in the window?

A.   That is me.

Q.   How did you get to there?

A.   So once we called for the lockdown of the building, I

entered through the Lower West Terrace up to the Crypt, and I met with my Lieutenant Jeffers, and she asked for us to make sure there were no breaches of the building in the wings, and I ended up going down the Senate Wing.

Q. Do you remember this moment?

A. Yes.

Q. What was your initial reaction when you saw this?

A. So being on the Upper West Terrace before, I honestly was in shock. I didn't believe that they would come into the building, and I feared for my life.

Q. Let's watch for just a minute.

(Video played.)

I'm stopping at 12:12. I can see that you're sort of moving with both arms. What are you doing there?

A. I'm determining which level of force that I planned on using at that time. I decided on using less than lethal force by using my pepper spray. I realized that with the amount of people that were there, using lethal force would probably end up with more casualties on law enforcement side and on the rioters' side. So I wanted to use less force.

Q. So what did you do with the pepper spray?

A. I sprayed the individuals that tried to enter that window.

Q. Then what happened?

A. So after I used all the pepper spray in the can that

we're issued, I retreated back to the Crypt.  There was a media near there, so I told them to run back to the Crypt.  I ran to the Crypt and I told everyone who was there that the building's been breached and that they need to get out of the area.

Prior to that, I did go on my radio.  I tried to get on the radio, the radio was busy, so I had to use the emergency channel to say the building's been breached, we need to secure the chambers.

Q.   I'm playing until 12:52.

(Video played.)

Can you describe the man in blue here?

A.   That appears to be the same gentleman that I described earlier.

Q.   And what is he doing?

A.   He's entering the building.

Q.   And at the risk of stating the obvious --

A.   Sorry.  He's entering the building through a window that was broken.

Q.   I'm going to play just for a few more seconds.

(Video played.)

Now, if we stop at 13 minutes, I can see some protesters are walking in the direction that it appears you went.  Where does that go?

A.   That goes to the Crypt of the Capitol.

Q.   And other protesters, including the man in blue -- I don't know if the defense will stipulate to that being Mr. Bozell --

MR. SHIPLEY:  Yes.

BY MR. BALLOU:

Q.   If Mr. Bozell was walking in the other direction, where does that go?

A.   That leads towards the Senate Chamber.

Q.   Pulling up what's been marked as Government Exhibit 1008. Playing for about five seconds.

(Video played.)

Where is this?

A.   That is inside the Senate Wing Door.

MR. BALLOU:  Okay.  Government moves to admit Exhibit 1008.

MR. SHIPLEY:  No objection.

THE COURT:  Without objection, 1008 is admitted.

(Government Exhibit No. 1008 received into evidence.)

BY MR. BALLOU:

Q.   I'm playing until 8 seconds.

(Video played.)

Do you see the highlighted man?

A.   Yes.  That appears to be the same gentleman that I described earlier.

Q.    I'm playing until 19 seconds.

(Video played.)

What is the man in blue doing?

A.    He is hitting the window and breaking it.

Q.    And, again, we can play the whole video if you'd like, but how many times does he appear to strike the window?

A.    From the previous video -- no, that was a different area. But this one looks like five times.

Q.    I'm pulling up finally Exhibit 100.  So we're pulling up Exhibit 100.  Oh, excuse me.  Let me just pull up 1008 one more time.  See if we got to the end of the video.

I apologize.  I stopped the video prematurely.  So we'll start at the beginning here.

THE COURT:  1008, not 100?

MR. BALLOU:  Yes, sorry, I'm going back to Exhibit 1008.  If we can track how many times he strikes this.  I stopped this prematurely.

(Video played.)

BY MR. BALLOU:

Q.    How many times did he strike the window?

A.    Approximately eight -- I mean 11 times.

Q.    We'll just play to the end of the video for completeness.

(Video played.)

Stopping at 37 seconds.  Is that you rushing in over there?

NICHOLS - DIRECT

A.    Yes.  I'm the officer.

Q.    We're going to watch a slightly longer clip of the same moment.  Pulling up Exhibit 100 this time.

      (Video played.)

      And you've seen a version of this video already, but where is this?

A.    The Senate Wing Door.

      MR. BALLOU:  The government moves to admit Exhibit 100.

      MR. SHIPLEY:  No objection.

      THE COURT:  Government 100 is admitted without objection.

                            (Government Exhibit No. 100

                                received into evidence.)

BY MR. BALLOU:

Q.    Playing until 30 seconds.

      (Video played.)

      Okay.  What are you doing here?

A.    I am deploying my pepper spray.

Q.    Who are the other people in the hallway here?

A.    That is media.

Q.    What are they doing?

A.    So the media -- well, you can see they're taking pictures of me deploying the pepper spray.  So the media, they're always stationed, they're stationed in the Capitol building. So they're there doing their job.

Q.   I'm going to play until 36 seconds.

(Video played.)

Okay.   What did you just do there?

A.   So in that moment I deployed my pepper spray on the individual who came through.  As I was deploying my pepper spray I turned to the media and told them to run.  And then I used the rest of my pepper spray on anybody else that was in that window, and then I retreated towards the Crypt of the Capitol.

Q.   Was the pepper spray effective in deterring the rioters?

A.   No.

Q.   And you mentioned earlier that you retreated backwards. Where did you go when you retreated?

A.   So I went to the Crypt of the Capitol to warn everyone else that was there that the building had been breached.

Q.   And you testified earlier that you feared for your life when you responded to this moment.  Right?

A.   Yes.

Q.   Why did you fear for your life?

A.   Because I was outnumbered by a mob of people who were -- had gone past multiple police lines and disobeyed all orders.

Q.   I'm going to go to 1:13.  I'd like you to focus on the window that's been smashed open.

(Video played.)

You see the man that I just circled?

A.   Yes.

Q.   What is he doing?

A.   He's entering the building through a broken window.

Q.   And what's that sort of piece of furniture on the ground?

A.   That is a -- that is like a museum piece.  You know, the Capitol is a living, working museum, I believe.  So it's a museum piece that has different information for people who come on tours.

Q.   And the man in blue just stepped over that?

A.   Correct.

     MR. BALLOU:  I can't recall.  Did we move to admit Government Exhibit 100?

     THE COURT:  100 is in evidence.

     MR. BALLOU:  Okay, great.

   No further questions, Your Honor.

     THE COURT:  All right.  Mr. Shipley.

     MR. SHIPLEY:  We can break or --

     THE COURT:  I was just going to ask you, how long do you think your cross-examination --

     MR. SHIPLEY:  15 minutes.

     THE COURT:  15 minutes?  I guess we'll take our midday break now and we'll resume at 1:45.  All right?  Thank you.

     (Lunch recess from 12:28 p.m. to 1:54 p.m.)

     THE COURT:  All right.  We're ready to go again.  And that will be with the cross-examination by Mr. Shipley.

NICHOLS - DIRECT

Sergeant Nichols, I remind you you're still under oath. Mr. Shipley.

MR. SHIPLEY:  Having the lunch hour to go through the notes, I could have done 15 minutes but I actually don't have any questions, Your Honor.

THE COURT:  Then you're done for the day, Sergeant Nichols.

MR. SHIPLEY:  My apologies for bringing you back.

THE WITNESS:  Thank you.

THE COURT:  All right.  Thank you very much.  You're excused.  And we'll go to the next witness.

(Witness steps down.)

MS. AKERS:  The government calls Officer Keith Robishaw.

KEITH ROBISHAW, WITNESS FOR THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MS. AKERS:

Q.   Good afternoon.  Could you please state and spell your name for us?

A.   Yeah.  My name is Keith Robishaw.  My last name is spelled R-O-B-I-S-H-A-W.

Q.   And Officer Robishaw, where do you work?

A.   United States Capitol Police.

Q.   What is your position?

A.   Technician now.  I'm with the K9 unit.

Q.   Did you get promoted recently?

A.   I did.

Q.   Congratulations.

A.   Thank you.

Q.   How long have you worked for the Capitol Police?

A.   Going on eight years.

Q.   And have you worked in different posts during that time?

A.   Yes, I have.

Q.   Can you give us a brief rundown?

A.   So when I came on the United States Capitol Police, I was assigned to the House Division.  From there I went to the Capitol Division for a spell and then back over to the House.  But I have worked various posts.

Q.   Throughout the Capitol building?

A.   Throughout the Capitol.  Correct.

Q.   Are you familiar with the layout of the Capitol building?

A.   Yes, ma'am.

Q.   Were you working for the United States Capitol Police on January 6, 2021?

A.   Yes, I was.

Q.   What was your position that day?

A.   I was assigned as an additional ER, Emergency Response Unit.  It's like our building patrol.  And I was assigned to the Cannon House Office Building.

Q.   Where is the Cannon House Office Building in relation to

the Capitol building?

A.   It's directly across the street on Independence.

Q.   What uniform were you wearing that day?

A.   Uniform of the day, similar to this, but it was Class Bs.

Q.   Anything unusual happen in the morning when you got to work?

A.   Yeah.  You know, we had the crowd started amassing outside the Capitol.  We were getting ready for our day. They were giving out assignments.  And then the really unusual part was the bomb threat that was called out earlier in the morning.

Q.   And did you respond to that?

A.   I did.  We were told to meet out on New Jersey Street right outside the Cannon.

Q.   Did there come a time when you then responded to the Capitol building?

A.   Correct.  After we took care of evacuating the Cannon House Office Building, I was told to, with some of the other officers, muster back outside the Longworth main door.

Q.   To the Capitol building?

A.   Yeah.  Well, we went out the Longworth main, and then we all started talking and we heard all the calls for service and so we took it upon ourselves -- it was a handful of officers, like five officers and like a couple sergeants -- then we made our way over there using the tunnels to the Capitol.

Q.   When you say you heard the call for service, how did you hear that?

A.   So the calls that I remember coming across were from the west front, and everyone moving up, and they kept saying they needed more support, and they needed additional officers and some of the hard squad guys to respond because they were losing ground and getting pushed up the stairs.

Q.   Were you hearing that on the radio or a different form?

A.   Correct.   Through the radio.

Q.   So you testified that you came under -- through the tunnels --

A.   Correct.

Q.   -- to the Capitol building.   Where did you go next?

A.   So having worked the Capitol Division before on midnights, I kind of took the lead with the officers that I was with and kind of led them through the Cannon, through their basement, to the -- what was it? -- the west front terrace doors right there.

Q.   And did you stay outside when you arrived at the Capitol building?

A.   So when I arrived inside the Capitol to those set of doors, there were several officers in hard gear coming inside who had been sprayed with some sort of chemical irritant, and you know, their eyes, they couldn't see.   Various staff, including the Architect of the Capitol, they were bringing

people in to get them deconned, to rinse their eyes out, to try and get them back in the fight.

I was kind of thinking if I go out there, I don't have the hard gear they had and they're getting overran, I'll just become another casualty, that I'd have to come back in because I don't have the gear they had. But at that time we were moving the screening machinery out of the way to get more officers in just because more and more kept coming. We actually started a queue. They were all just sitting on the ground, waiting to be deconned by the Architect of the Capitol. That was when the next series of calls came out that they had made their way inside the building.

Q. When you say "they," who are you referring to?

A. The rioters.

Q. When you heard that next call, once people made it into the building, what did you do next?

A. I felt that that would be, not a better use of my time but something I could assist with, not having the riot gear, fighting outside, I could more better assist inside the building with the gear that I had.

Q. And so you were in the Lower West Terrace doors. That's sort of the middle of the Capitol building. Right?

A. Correct.

Q. Where did you go next?

A. We turned around and I ran up the staircase that's right

there that leads straight up into the Rotunda.

Q.   Once you were in the Rotunda, were there unauthorized people in the building at that point?

A.   The calls were coming out that they were in there but I hadn't seen them yet.  We were trying to make our way and figure out where they were coming in at and do our best to get to where they would be so we could meet them.

Q.   So you were in the Rotunda.  And where did you go next?

A.   So I made my way from the Rotunda to the Rotunda door that leads outside, and there were some officers that were standing there and they were contemplating how to assist the four officers in hard gear that have now been pushed up against those doors by the crowd that had made their way all the way up the stairs and shoving them against those doors. From there I made my way over to the Senate side.

Q.   And where specifically in the Senate side did you respond to?

A.   I found myself, after listening to the calls and trying to figure out where everyone was going, I found myself on the second floor, the Ohio Clock Corridor, outside the chambers.

Q.   And when you refer to chambers, during your time that we're talking about here today, what chambers are you referring to?

A.   The Senate Chambers.

Q.   Were you aware of whether Congress was in session in the

Senate Chamber at that time?

A.   Yes.

Q.   I'm going to pull up what's been marked as Government Exhibit 1011.  In preparation for your testimony, Officer Robishaw, did we watch this video together?

A.   Yes.

Q.   And is this four, at times, videos sort of side by side showing the same occurrence from different angles?

A.   That is correct.

Q.   And you see a time stamp in the upper right-hand corner?

A.   I do.

Q.   And is that consistent with the CCTV time stamp?  You can look in the upper right-hand corner video.

A.   Correct.

Q.   To orient ourselves, if we're looking in the upper right-hand corner, what area of the Capitol building is that?

A.   We're looking at the right one, that would be the Ohio Clock Corridor looking back down toward the House way.

Q.   So that's the upper right-hand corner I'm circling here?  Ohio Clock Corridor.

A.   Correct.  Looking straight down the Capitol.

Q.   And that's near where you responded to.  Correct?

A.   Correct.

Q.   And if we look at the bottom left-hand corner that I'm circling, what area is that?

A.    That's down there on the first floor of the Senate Wing.

Q.    Okay.  And then to the right of the Senate Wing Door entry there that you just identified on the bottom right-hand corner, can you tell where that is?

A.    Yeah.  Looks like it's in the same kind of vicinity, going up to the Grand Staircase.

Q.    All right.

MS. AKERS:  Your Honor, I move to admit Exhibit 1011.

MR. SHIPLEY:  No objection.

THE COURT:  Without objection, 1011 is admitted.

(Government Exhibit No. 1011 received into evidence.)

BY MS. AKERS:

Q.    I'm going to play first just a few seconds here.

(Video played.)

I played from 2:22 to 2:28, and I'm circling a person in blue at 2:13:43 p.m. on the bottom left-hand corner.  Do you see that person?

A.    I do.

Q.    What does he appear to be doing?

A.    Can you go back?

Q.    Sure.

A.    I'll look at it again.

(Video played.)

Oh, yeah.  Climbing through the window.

Q.   All right.  I'm going to continue playing at this time.
With sound.

(Video played.)

All right.  I stopped at 3:05.  On the right-hand side
of the screen do you see someone who appears to be wearing a
uniform?

A.   I do.

Q.   Are you familiar with who that is?

A.   Yes.

Q.   Can you tell the Court, please.

A.   Officer Goodman.

Q.   Where approximately in the Capitol building is Officer
Goodman?

A.   He is by the Senate door, by the Grand Staircase of the
Senate.

Q.   So Senate Wing side by the Senate door?

A.   Correct.

Q.   And is this still the first floor?

A.   Yes.

Q.   All right.  I'm going to continue playing.

(Video played.)

I stopped the video at 4:09.  In the upper right-hand
corner, can you identify what location of the Capitol building
that is?

A.   Still in the Senate Wing but they're going up to the

second floor.

Q.   And I'm going to circle a person in the middle of the screen who appears to have a red and white item on his head. Do you see that person?

A.   I do.

Q.   The left-hand side of the screen, where this group has entered now, where is that in relation to that right-hand side of the screen person I just circled?

A.   It's just down the hallway.  It's like two lefts -- or a right and -- it would be a couple rights.

Q.   So, in other words, the people on the upper right-hand corner are coming up the stairs and they're going to enter the room on the left-hand side of the screen.

A.   Yeah.  Correct.  There we go.

Q.   Very close in space.

A.   Yeah.

Q.   And --

A.   10 feet.

Q.   -- what is the area on the left-hand side of the screen called?

A.   That's the Ohio Clock Corridor.  It's right outside the Senate Chambers.

Q.   What did you see in this approximately minute of video footage that we watched?  What happened from that entry point at the Senate Wing Door up until this point?

A.   A lot of shouting, chanting, moving up, intimidating the officer, pushing him back up the stairs.

Q.   We're going to continue playing.

(Video played.)

I stopped the video at 5:05.  Do you recognize anyone in this video?

A.   Yeah.  That's myself.

Q.   I'm circling a person in the middle of the screen with a blue Covid mask on.  Is that you?

A.   That is me.

Q.   And you're in the Ohio Clock Corridor?

A.   Correct.

Q.   What's happening right now?

A.   The crowd has kind of met with our police line that we have established right there outside the chambers.

Q.   And what are you trying to do at this point?

A.   Just talk with the crowd, keep them, I don't know -- there was so much going through my mind at the time, but I told myself that I didn't want anyone passing us and that this was going to be their final -- you know, they weren't going to get past us.

Q.   Why was it important, from your perspective standing in the Ohio Clock Corridor, that this group didn't get past your line?

A.   Because the senators and congressmen were in session at

the time and we had no idea if they were still in the building or had left the building.

Q.    Where is the congresspeople in the Senate Chamber in relation to where you are right now?

A.    Where the senators are or the congresspeople?

Q.    Excuse me.

A.    Sorry.

Q.    That's a good clarification.

A.    My bad.

Q.    The, I guess, senators because you're on the Senate Wing side, where is the Senate Chamber in relation to where you're standing right now?

A.    If you're looking at me, it's directly to my left. They're right outside the chamber.

Q.    Can you describe to the Court the tone and demeanor of the crowd as they approached the officer line including yourself around this time?

A.    Oh.  Very hostile.  Irate.  Angry.  We had known that they had used violence to gain entry into the building since we had heard the radio calls that they were breaking out windows to gain entry.

Q.    And did you use any techniques to try to deescalate the situation at this time?

A.    Yes, ma'am.  So in the academy they go over a technique called Verbal Judo.  It's a trademarked training that we go

ROBISHAW - DIRECT

through, and it's how to, you know, talk with individuals and build rapport with, you know, people we are in contact with on a daily basis and try to, you know, ease tension.  And it's pretty much an officer's first line that we go to to try and, you know, quell any type of violence or situation that arises.

Q.   Given the proximity of this crowd to the Senate Chamber, why did you and your fellow officers not use force at this point?

A.   For the simple fact that we were outnumbered.  You know, there wasn't as many officers that we had on the line as they had.  People kept coming in, flooding out, spilling through the building.  So we were just simply outnumbered.

Q.   And is it fair to say that there were some people who were closer to the police line and others who were sort of further back in the Ohio Clock Corridor?

A.   That is correct.

Q.   Did the number of people in the Ohio Clock Corridor, whether they were the front of the line or further back in the room, impact your ability to do your job?

A.   I mean, no.  I still did what I was supposed to do and what I thought was best.  But it still was a really bad day.  You know, it could have been better if it never happened, but it did and I think as an agency we did the best we could.

Q.   All right.  I'm going to now pull up another exhibit, Exhibit 109.

MS. AKERS:  Your Honor, the parties have agreed to the admission of the 100 series, which is CCTV footage, so I'd move the admission of that series right now so we don't have to go through every time as we're watching those.

THE COURT:  The entire series?

MS. AKERS:  Correct.

THE COURT:  Okay.  Go ahead.  109.

MR. SHIPLEY:  That's correct, Your Honor.  No objection.

THE COURT:  So 109 is admitted.

MS. AKERS:  And we would move all of the 100s as well.

THE COURT:  And they can all be admitted, Mr. Shipley, without objection?  The entire 100 series can be admitted without objection?

MR. SHIPLEY:  Yes.  Correct, Your Honor.

THE COURT:  All right.  We'll do that.  And that would be -- 100 is already admitted.  So it would be 101 through 140.

MS. AKERS:  That's correct, Your Honor.

(Government Exhibit Nos. 101-140 received into evidence.)

THE COURT:  All right.

BY MS. AKERS:

Q.   We're pulling up now what's been marked as Government Exhibit 109.  Do you recognize the area that this exhibit is depicting, Officer Robishaw?

ROBISHAW - DIRECT

A.    Yes, ma'am.

Q.    Where is it?

A.    We're still in the Ohio Clock Corridor.

Q.    I'm going to play five seconds.

(Video played.)

And I'm going to circle a person in a red, white, and blue hat, blue sweatshirt in the lower right-hand corner. Do you see that person?

A.    Yes, I do.

Q.    I'm going to continue playing here.

(Video played.)

All right.  I just stopped the video.  And do you still see that person?  I'm going to circle him on the right-hand side of the screen.

A.    Yes.

Q.    Do you also see yourself depicted in this video?

A.    I do.  I just came up at the top left screen.

Q.    Can you circle yourself?

A.    I can.  Yes.

(Witness complies.)

Q.    Okay.  You circled a person with a blue mask in the top left-hand corner of the screen.  Correct?

A.    Correct.

Q.    And when you were approaching this line of officers who was facing this line of people who entered the building, what

was the tone and the demeanor of this crowd at this point?

A.    Still really angry, hostile, yelling all sorts of things.

Q.    And can you indicate, now that we have more of an aerial view, where the Senate Chamber is in location to the officer line?

A.    I'm going to touch the screen.

Q.    Sure.  You drew an arrow in the upper left-hand corner of the screen behind your head.  Is that an entry point to the Senate Chamber?

A.    Correct.  Those are like the main doors, if you will.

Q.    Now I'm going to pull up Government Exhibit 1013.  And have we watched this video in preparation for your testimony, Officer?

A.    Correct.

Q.    Does it show various video footage of January 6 with an overlap of United States Secret Service radio?

A.    Yes.

         MS. AKERS:  The government moves to admit Exhibit 1013.

         MR. SHIPLEY:  No objection.

         THE COURT:  Without objection, 1013 is admitted.

                              (Government Exhibit No. 1013

                               received into evidence.)

         MS. AKERS:  All right.  I'm going to play this exhibit.

    (Video played.)

BY MS. AKERS:

Q.   Officer Robishaw, what was going on in this video here?

A.   Throughout the video, it's footage that has the Secret Service radio traffic over top of it, kind of giving you what they were saying and what they were doing and giving a really good perspective that they were still in the chambers throughout a good majority of the time that we had encountered the rioters outside the chamber.

Q.   And does it appear that there was an evacuation going on at this time?

A.   Correct.  At the end of the video they did decide to evacuate.

Q.   And are you familiar with who was evacuated?

A.   Correct.  Yes.  It was the vice president.

Q.   At the end of the video prior to this evacuation route that we see here now, there seemed to be smoke in the air. Were you in the Ohio Clock Corridor when that happened?

A.   Correct.  I was.

Q.   Can you explain to the Court what happened at that time?

A.   Yes.  So we were -- well, I was -- I'll speak to what I was doing.  I was sitting there talking to the crowd still. And as I was trying to build rapport with some of the crowd to keep them at bay, I still don't know what it was.  They said it was a fire extinguisher.  I still don't know.  I just assumed, I went with what they said, but something had

exploded.  It was a very loud noise.  It took everybody by surprise.  And then a mysterious substance of a white smoke filled the hallway.  I kind of just reacted and I yelled at everyone to back away.

So our police line moves back from that smoke, and so did the rioters.  They moved back as well, except for like one or two individuals that were extremely aggressive at that moment, yelling, and they were threatening manners and body language.

Q.    Did you perceive the crowd in the Ohio Clock Corridor to be a threat at this time?

A.    Pretty much throughout the entire day.  I just assumed that everybody was a threat using the violence they utilized to make entry into the building by breaking windows.  At one point in that hallway, in the Ohio Clock Corridor, I actually asked if any of the individuals that were there in front of me had weapons, and they actually decided to show me various things.  People pulled out knives, bear spray, all different things like that.  So I just assumed from that point on that I was just going to assume everybody was armed with something.

Q.    Typically, when visitors enter the Capitol building, do they typically have to go through some sort of security screening?

A.    That is correct.  Yeah.  Your bags get x-rayed just like you would at the airport.  All your metals and everything comes out of your pockets, belts, and you walk through a metal

detector. And if anything goes off, then additional screening will follow with a hand wand.

Q. So whether someone is walking a hallway by themselves or with a group of people in a given location, if they haven't gone through that security, what is the risk that you as a Capitol police officer face?

A. Well, any given day, if it was a normal day, anybody in the Capitol or any of the House office buildings would have been screened. There's no way to get into the building without being screened. So on that day we knew that everybody in that building hadn't been screened as normally would have been. So you just assume.

Q. I'm going to pull up another CCTV footage. This is Government Exhibit 112. Do you recognize this area?

A. Yeah. This is -- I don't know its technical term but it's a hallway right off of the Ohio Clock Corridor. You can kind of see it -- well, you don't see it from, but when we were look looking at the last video footage, it's directly underneath that camera.

Q. And so if I circle the doorway in the middle of the screen, what does that doorway lead to?

A. That leads to the Ohio Clock Corridor, right where everybody was, all the rioters were outside of.

Q. I'm going to play this video.

(Video played.)

While I'm paused here at 11 seconds, do you see an individual walking by himself in this corridor?

A.   I do.

Q.   I'm going to continue playing.

(Video played.)

All right.  I stopped at 55 seconds.  What just happened here?

A.   You see the individual walk down the hallway, and right when he gets to the edge of the camera, he stops and turns around and proceeds to go the other way as if something had changed his mind to continue forward.  And as you can see, officers come up, so he probably heard the officers coming down the hallway.

MR. SHIPLEY:  I object and move to strike that.  That's all speculation.

THE COURT:  Overruled.

BY MS. AKERS:

Q.   And then after he turned around and started walking back down the hallway, what did you witness happening?

A.   He continued to go down the hallway and then walked into the open door.

Q.   Do you know what that room is?

A.   It's got like tables and chairs.  It's kind of like a place where senators go and have lunch.

Q.   Do you know the name of the room?

ROBISHAW - DIRECT

A.   I do not remember.

Q.   No problem.  And then does it appear after the officers take him out, they are headed back towards the Ohio Clock Corridor?

A.   That is correct.

Q.   I'm now going to pull up Government Exhibit 110. I'm going to play 4 seconds.

(Video played.)

I stopped at 4 seconds here.  Do you see the man in the lower right-hand corner of the screen with the red and white hat who appears to have just re-entered the Ohio Clock Corridor?

A.   Yes, ma'am.

(Video played.)

Q.   I played until 8 seconds.  And then what did this person just do?

A.   Can you go back?

Q.   Sure.

A.   Yeah.  He just turned and walked out, going back towards the Grand Staircase.

Q.   I'm showing you now Government Exhibit 126.  You said he walked toward the Grand Staircase.  Are you able to identify that in this CCTV footage?

A.   Correct.  I'm going to touch the monitor again.  This is the Grand Staircase on the Senate Wing, on that side of the building.

Q.   You made a green circle on the left-hand side of the screen where the staircase is.  Correct?

A.   Correct.

Q.   What else do you see in this visual here?

A.   The Majority Whip's office is right here.

Q.   And are you familiar, is that an office on the Senate side of the building?

A.   Correct.

Q.   I'm going to play the video, Exhibit 126.

     (Video played.)

     I stopped it here at 4 seconds.  Do you see that same individual with the red, white, and blue hat and the blue sweatshirt?

A.   Yes, ma'am.

Q.   What does he appear to be doing?

A.   Checking to see if the doors open.

Q.   Based on your experience working in the Capitol building, are office doors typically locked during the day?

A.   Correct.

Q.   I'm going to continue playing until 12 seconds.

     (Video played.)

     And does it appear that individual wasn't able to get into that room?

A.   Yes.

Q.   I'm now going to skip ahead in time a little bit and

go to Government Exhibit 113.  Are you familiar with this location in the Capitol building?

A.    Correct.

Q.    Where is this location?

A.    The third floor.  It leads up into the galleries.

Q.    Is this still the Senate side of the building?

A.    That is correct.

Q.    And earlier we were at like 2:17 p.m.  What time are we at now?

A.    Up in the top it says 2:40:40.

Q.    I'm going to play 23 seconds.

      (Video played.)

      I'm going to circle a person who appears to have sunglasses on, a hat, in the middle of the screen.  Do you see that person?

A.    Yes, ma'am.

Q.    Do you also see a person sort of right behind him in an orange, bright orange sweatshirt?

A.    I do.

Q.    And do you see another person I'm circling who seems to be sort of bending over towards the wall?

A.    Yes.

Q.    Are you familiar with what is right there where that person seems to be bending over?

A.    There's a water fountain right there.

Q.   And this hallway -- did you say this was on the third floor?

A.   Correct.

Q.   In relation to the Senate Chamber, where is this hallway?

A.   So the chamber itself is one floor down, but the galleries is right where they're headed for.  So right behind the camera's the Senate Gallery.

Q.   And when we say the Senate Gallery, is that the same broad room as the Senate floor?

A.   That is correct.  It's just separated by the level of the floor.

Q.   Can you get to the Senate floor if you're just in the Senate Gallery?

A.   If you wanted to jump, yes.

Q.   Normally, how would one get, if they were on the Senate Gallery, down to the Senate floor?

A.   Normally, if you were authorized to be in there, you would, you know, go through the proper means, and then you would just go through the door at the second floor.  You would use the door.

Q.   Would you have to exit the Senate Gallery, go outside the Senate Gallery, down the stairs or elevator, and then into --

A.   That is correct.  Or use the stairs.

Q.   Okay.  I'm now going to pull up Government Exhibit 435.  And is this a video, Officer Robishaw, that we watched

together in preparation for your testimony that shows a route like the one we just saw in the CCTV footage?

A.    Yes.

MS. AKERS:  The government moves to admit Exhibit 435.

MR. SHIPLEY:  No objection.

THE COURT:  Without objection, 435 is admitted.

(Government Exhibit No. 435

received into evidence.)

BY MS. AKERS:

Q.    I'm going to play starting at 3:04.

(Video played.)

All right.  I'm stopping at 3:21.  And first what I'm going to do is circle a person in the middle of the screen who appears to be wearing a blue hoodie.  Do you see that person?

A.    Yes, I do.

Q.    It appears that the crowd at this point is walking upstairs.  Do you know where they're walking from, what area that is?

A.    It's the Rotunda doors I was talking about.  So there's the stairs and an elevator.  They're going up the stairs that lead you to the third deck that will lead to the gallery.

Q.    I'm going to continue playing.

(Video played.)

I'm stopping at 4:24.  As this person who just took a drink from the water fountain next to the man in the orange is

walking down the hallway, what do you hear the crowd chanting?

A.   Quite a few different things:  Treason.  Freedom. America.  Our house.

Q.   Okay.  I'm going to continue playing.

(Video played.)

I just stopped at 4:43.  I'm not going to get it exactly, but at 4:42, do you see a man in a blue sweatshirt standing next to the person videoing?

A.   Correct.

Q.   All right.  I'm going to continue.

(Video played.)

I stopped at 5:26.  What area of the Capitol building are we in now?

A.   The area?  We're still in the Senate side.  This is right outside the Senate Gallery.

Q.   And you see the person in the middle right of the screen that I'm circling with the red, white and blue hat and blue sweatshirt?

A.   I do.

Q.   What appears to be happening at this point?

A.   At this point it seems the crowd has started to force their way into the galleries through those doors by assaulting two gentlemen in, like, suit attire.

Q.   Like plain clothes?

A.   Plain clothes, yeah.

Q.    I'm going to continue playing.

      (Video played.)

      I stopped at 6:45.  What's going on here, Officer?

A.    It sounds like, you know, they're still all chanting certain things, yelling, and it also sounds like they're trying to come up with a plan to how to get down to the chambers itself.

Q.    So at this point, have the rioters breached the Senate Chamber?

A.    It would appear no, that they have not yet.

Q.    Sorry.  I keep using the wrong terminology.  Senate Gallery.

A.    Yeah.  Okay, yes.  They are in the gallery.  They have made it to the gallery, but they're not in the chamber itself yet.

Q.    Not yet.  And I'm circling on the middle right-hand side of the screen the man with the blue sweatshirt.  Do you see him?

A.    I do.

Q.    What does he appear to be doing to you?

A.    It would appear he's going through one of the bags that are under the seats in the galleries that contain like escape hoods.  It's like a mask you can put on in case of a fire. And they're random -- no, not randomly placed, but they're strategically placed throughout the rows at different spots.

Q.   I'm going to continue playing.

     (Video played.)

     I'm actually going to stop.  Did you just hear what that man said?

A.   No.  Go back?

Q.   Sure.

     (Video played.)

A.   "Sacred ground."

Q.   Would you agree with that characterization that the Senate Chamber is in fact a sacred area of the Capitol building?

A.   I would.  And I also stated such in another video.

Q.   In your time as -- working for the United States Capitol Police for eight years, prior to January 6, 2021, had you ever even been on the Senate floor?

A.   No, ma'am.

Q.   Why not?

A.   We were never allowed to.  We had access to the House Chambers for midnights because we would let the cleaning crew in to do their maintenance or if they had to fix things or what have you before Congress would come in.  But we never had access to the Senate Chambers.

Q.   Is it fair to say that people in Congress generally agree with the characterization that this is a sacred room?

A.   I would say so, yes.

Q.   I'm going to continue to play.

     (Video played.)

     I stopped at 7:43.  I'm circling a man who's immediately to the left of this guy's chin in the red hat and blue sweatshirt.  Do you see him?

A.   I do.

Q.   I'm going to play one more second.  Stopping at 7:44. What does this man appear to be doing at this time?

A.   He's climbing over the railing.

Q.   And normally I guess is it typical to climb over the railing?  How do senators normally get from place to place in the gallery?

A.   Well, the gallery is more so for people who are visiting. So normally when they would come, they get put strategically throughout the different doors that are open, and they funnel into their section.  And normally you wouldn't cross that specific railing to get to that side.  You would go out and around, or up and down the railing.

Q.   I'm going to continue playing.

     (Video played.)

     I'm stopping at 9:17.  On the very far right-hand side of the screen do you see the person I circled in the blue sweatshirt?

A.   Yes, ma'am, I do.

Q.   Where does he appear to be in the Senate Gallery in

relation to where the rioters actually forced their way in?

A.   It would appear in the video that they entered -- I'm going to touch the screen --

Q.   Sure.

A.   -- that they entered on this side, on the left side of the screen, and that he had walked around the gallery, going over those railings, to make it to this side.

Q.   So fair to say he made it to the opposite side --

A.   Correct.  He's on the opposite side of what they entered.

Q.   I'm going to finish playing.

(Video played.)

All right.  I stopped at 10:17.  What happened in this latter half of the video?

A.   This latter half, an individual went from the galleries and jumped off the balcony into the chamber.

Q.   When you were listening to that video, did you hear the crowd saying anything?

A.   That, you know, they were talking about the individual who had jumped from the gallery, and that, you know, they should sit in Pelosi's seat, even though that's not her seat. That would be the seat where the vice president would sit when senators are in session.

Q.   All right.  Just one moment, please.

     MS. AKERS:  Your Honor, I'm about to pull up Exhibit 304.  The 300 series is footage from the Senate floor to which

the parties entered a stipulation as to the authenticity of and so I would move the admission of the 300 series that we're going to review.

THE COURT:  That would be 301 through 305.  Any objection, Mr. Shipley?

MR. SHIPLEY:  No objection.

THE COURT:  All right.  Those are admitted.

(Government Exhibit Nos. 301-305 received into evidence.)

MS. AKERS:  Just one moment, Your Honor.  I'm having a computer glitch, but it's loading.

THE COURT:  Take your time.

MS. AKERS:  Thank you.

BY MS. AKERS:

Q.   All right, Officer Robishaw.  I pulled up Government Exhibit 304.  Do you recognize this area of the Capitol building?

A.   Yes, ma'am.  That's the Senate Chambers.

Q.   I'm going to play starting at 13 minutes.  And can you tell us what time this is in the middle of the screen?

A.   It says "14:46:18:21."

Q.   I'm going to start to play here.

(Video played.)

MS. AKERS:  I'm going to pause, and give me just one moment, please.

Your Honor, if I could have just two minutes, I'm going to reload this on the desktop so it doesn't keep glitching out.

THE COURT:  So it's going to take a couple minutes?

MS. AKERS:  Yeah.

THE COURT:  Then we're going to take our afternoon break.

MS. AKERS:  Thank you so much.  I apologize.

THE COURT:  All right.  We'll take a break and resume at three o'clock.  And we'll be going until about 20 after 4:00 today.

(Recess from 2:48 p.m. to 3:13 p.m.)

THE COURT:  Ms. Akers.

MS. AKERS:  Thank you, Your Honor.

BY MS. AKERS:

Q.   We're going to pull up Government Exhibit 304.  And we're starting at 13 minutes and we're going to play from here.

(Video played.)

We stopped at 13:33.  Officer Robishaw, what happens here?

A.   You can see the two individuals.  One is covering the camera with his jacket, and the other has moved the camera facing up towards the ceiling.

Q.   And we're still in the Senate Gallery here.  Correct?

A.   Correct.  They're in the Senate Gallery.

Q.   Are you familiar with what these cameras are typically

used for in the Senate Chambers?

A.    Yeah.   There are various cameras throughout the gallery that record when they're in session.   It's like C-SPAN. You can watch it live.

Q.    Does it record the happenings on the Senate floor below?

A.    Correct.

Q.    Can we please play.

(Video played.)

Can we please pause.   At 13:47.   And what just happened here?

A.    The camera was then turned from facing the ceiling back down and then turned to its -- that right side facing the floor.

Q.    And now that it's facing the floor, how does that impact its ability to record what's going on on the Senate floor?

A.    Well, it will not be able to record what's going on on the Senate floor.   It'll be recording what it's looking at, like a camcorder.

Q.    And when say it was moved, who are you referring to who moved it?

A.    The person in the white and red hat with the sunglasses, blue hoodie.

Q.    I'm now going to show you Government Exhibit 438.   Have we watched this video in preparation for your testimony?

A.    Yes.

Q.   And are you familiar with the events depicted in this video footage?

A.   I am.

Q.   Do they comport with your recollection and experience on January 6?

A.   Yes.

MS. AKERS:  We move to admit Government Exhibit 438.

THE COURT:  438.  Mr. Shipley?

MR. SHIPLEY:  No objection.

THE COURT:  438 is admitted.

(Government Exhibit No. 438 received into evidence.)

BY MS. AKERS:

Q.   I'm going to start playing this for you at 4:40.

(Video played.)

And stopping at 4:52, do you see a man in the red, white, and blue hat and the blue sweatshirt that I'm circling in the middle right-hand of the screen?

A.   I do.

Q.   What area is he in the United States Capitol at this point?

A.   They have now made their way -- and your individual there has made their way into the chambers itself.

Q.   I'll continue playing.

(Video played.)

ROBISHAW - DIRECT

All right.  I stopped at 6:04.  What's generally going on -- excuse me.  I'm going to stop at 6:03.  What's generally going on in the clips that we just watched here?

A.    That the individuals that made their way into the Senate Chamber have started going through all the effects of the different senators at their desks, opening, rummaging through papers, taking photographs of their personal notes or what have you, yelling, still screaming, talking amongst themselves, planning.

Q.    I'm going to circle the middle of the screen, the guy in the red hat, blue sweatshirt.  Do you see him there?

A.    I do.

Q.    Are you familiar with the location of that door?

A.    Yes.  Yes, I am.

Q.    Can you describe to the Court, if you were to exit that door, which it appears that person is doing, where would you exit to?

A.    You would exit right back to that hallway that we viewed a couple of exhibits ago, into the Ohio Clock Corridor.

Q.    And so earlier when you testified about the police line that you were holding with the rioters in front of you and the Ohio Clock Corridor and you made an arrow to a door, is this the door that you were referring to?

A.    That is the door.  That's their main door.  Yes, that's the door I was referring to.

Q.   I'm now going to pull up Government Exhibit 1009, which is a, what I'll call montage of the defendant's actions on the Senate floor, and so it's consisting entirely of exhibits from the 300 series which have already been admitted.  So we move to admit this montage.

MR. SHIPLEY:  No objection.

THE COURT:  Without objection, 1009, a montage, is admitted.

(Government Exhibit No. 1009 received into evidence.)

BY MS. AKERS:

Q.   I'm going to start playing at 3:48.  We're not going to watch this whole thing.  And before I start playing, just for identification purposes, do you see the man in the red, white, and blue hat and blue sweatshirt who I'm circling in sort of the right upper quadrant of the screen?

A.   I do.

Q.   I'm going to play.

(Video played.)

I stopped at 4:24.  Do you see that same man in the blue?

A.   I do.

Q.   And what appears to be happening at this point?

A.   Leading up to this point, he's on the phone.  He's got something in his hand, and then he's looking up at what appears to be the camera, realizing he's on the camera.

ROBISHAW - DIRECT

MR. SHIPLEY:  Objection.  That calls for speculation.  Move to strike.

THE COURT:  Overruled.

BY MS. AKERS:

Q.   I'm going to continue playing.

(Video played.)

Since we changed angles, I'm just going to circle the man in the blue sweatshirt.  Do you see him there?

A.   I do.  Yes, ma'am.

Q.   We're going to continue playing from 4:42.

(Video played.)

And what did you just see the man in the blue doing in this clip?

A.   It looked like he was instructing someone in the balconies to move the camera back down.  You can see him pointing at the two individual things and then pointing down as if to tell somebody to move them.

MR. SHIPLEY:  Again.  Move to strike.  "As if to tell someone"?  It's pure speculation.

THE COURT:  It is what he says it is and what he thinks it is, and I can take into account whether he knew or whether he was just surmising.  Overruled.

BY MS. AKERS:

Q.   I'm going to start playing now at 5:27.  And if you look in the bottom left-hand corner of the screen, do you see that

same individual we've been identifying in videos?

A.    You said bottom left?

Q.    Yes.  The red, white, and blue hat and sunglasses?

A.    Yes.

Q.    Okay.

(Video played.)

All right.  I stopped the video at 6:19.  I'm now going to pull up Government Exhibit 111.  What area is this?  Is this, first off, CCTV footage?

A.    Yes.

Q.    What area is this?

A.    We're back in the Ohio Clock Corridor.

Q.    What's the time here?

A.    Oh, I see it.  It's 2:55:30.

Q.    I'm going to play from zero seconds to 31 seconds.

(Video played.)

I stopped at 32 seconds.  Do you recognize anyone in this video?

A.    Myself is right in the center of the frame.  Would you like me to circle myself?

Q.    Sure.

A.    There you go.

Q.    And next to you do you also recognize the man in the blue sweatshirt?

A.    I do.

Q.   What were you doing at this time?

A.   In the video you see him exit and we start pointing this way and we're moving the rest of the people that had funneled out of the chambers down and back the way they came up.

Q.   When you say you see him exit, out of what door are you referring to?

A.   The chamber door that I referred to earlier that's right here.

Q.   And so you see the man in the blue sweatshirt exit there, and then you said you're funneling him down where?

A.   Back the direction they had originally come up.

Q.   Where were you trying to funnel him towards?

A.   We had discussed that we would push him back out the window they had come in.

Q.   And would that be on the first floor of --

A.   Correct.

Q.   What floor would you be on if you were in the Ohio Clock Corridor?

A.   That's the second floor.

Q.   Now I'm going to pull up Government Exhibit 129.

Do you recognize this area of the Capitol building?

A.   Correct.

Q.   We've seen it before?

A.   Yes, ma'am.

Q.   And where is this in relation to the Ohio Clock Corridor

that we were just looking at?

A.   It's -- from the video footage it was where we were walking from, so the Ohio Clock Corridor from this camera is behind us.

Q.   Going to play.

(Video played.)

You see the man in the blue walking out?

A.   I see him walking.  Yeah.

Q.   Are you walking behind him?

A.   I am.

Q.   What were you doing with your hand there?

A.   Pointing the people to go down.

Q.   All right.  I stopped at 25 seconds.  You end up going up the stairs it looks like.  Correct?

A.   Correct.

Q.   And the person in the blue went downstairs.  Correct?

A.   Yes.

Q.   All right.  I'm now going to pull up Government Exhibit 105.  Do you recognize this area of the Capitol building?

A.   Yes, ma'am, I do.

Q.   What area is it?

A.   That's the north door, is what we refer to it, is the north door.

Q.   Where is the north door in relation to the video footage that we're looking at on the screen?

A.   Where's the -- oh, so the door is right behind the camera.  So it's just outside of the camera.  You see the desk right there?  It's directly down of the frame.  And it's a series of two doors.

Q.   So the door's essentially under the camera.  If you were to walk towards the camera you would be walking towards the door?

A.   Yes.  You would see it's exit, it's got glass panels, you can see straight through both doors.

Q.   So if you were looking towards the door, would you be able to see the outside based on the glass panels --

A.   Correct.  If you were standing right here, looking this way -- if you're looking that way, yeah, you'd see the glass panels and you can look right outside.

Q.   It looks like you drew a stick figure.

A.   Correct.

Q.   I'll finish it for you.

A.   There it is.  Thank you.

Q.   I'm going to play 11 seconds here.

     (Video played.)

     And at 11 seconds do you see the person in the blue sweatshirt?

A.   Yes.

Q.   What direction does he appear to be looking?

A.   He's looking towards the north door.

Q. What time is it?

A. It's 2:57:31.

Q. Okay. I'm going to continue playing.

(Video played.)

Okay. Officer, you testified in the last video preceding this video in time that you directed this gentleman down the stairs so he could exit out the door. Does it appear that he exited when he made it to the first floor?

A. No, he did not.

Q. What actually did he do based on this video footage?

A. He's walking up toward the top of the frame.

Q. Okay. We're going to continue playing.

(Video played.)

And what's happening at the north door now?

A. It appears that the sergeant opened the door and they want everyone to be funneled from where they're coming from, down, out the door. And now they're fighting with the crowd, pulling them out of the door.

Q. I'm going to stop here at 1:22. And do you see in the upper top corner of the screen -- excuse me -- in the upper middle portion of the screen that person in the blue sweatshirt with the white emblem on the front?

A. Yes.

Q. I'm going to continue playing.

(Video played.)

I stopped at 1:40.  And what did you just see the gentleman do at this time?

A.    Could you roll back, please?

Q.    Sure.

A.    So you can see the individual walking down from the top of the screen.  He makes a left, which then he turns around abruptly and starts going down the adjacent hallway to what would have been his right.

Q.    I'm going to pull up Government Exhibit 106.  And is this the same location that we were just looking at?

A.    Correct.

Q.    Is it now 3:07 p.m.?

A.    3:07:10.  Yes.

Q.    About 10 minutes later from the time you testified from the last exhibit?

A.    Correct.

Q.    And I'm going to play here until 8 seconds.

(Video played.)

At 8 seconds, I'm stopping.  Do you see that man in the blue sweatshirt that I circled in the left middle of the screen?

A.    I do.

Q.    And at this point, what's happening?

A.    That they are now getting the crowd to walk outside the door.

MS. AKERS:  No further questions for this witness, Your Honor.

THE COURT:  Mr. Shipley.

CROSS-EXAMINATION

BY MR. SHIPLEY:

Q.    Setting aside just for a moment the testimony you gave that you gave them directions to go down the stairs and find an exit presumably, and that when he got to a point where he could see an exit, he went another direction.  Setting that aside for a moment.

A.    Setting that aside.

Q.    Yeah.

A.    Okay.  I got what you're saying.  I'm sorry.

Q.    Other than that, any place on that video where Mr. Bozell didn't follow the directions he was given?

A.    I mean, he did go downstairs.

Q.    And at no other point did he come into any encounters with either yourself or other law enforcement officers that you saw where he didn't do what they told him to do.  Right?

A.    That would be fair.

Q.    Like he went down -- we saw the video where he went down the hallway, you said there was like a room down at the end with a table and chairs where the senators eat sometimes.

A.    Yeah, where he went into the -- okay.

Q.    And an officer with a long gun sort of -- obviously see

ROBISHAW - CROSS

he's got the long gun, maybe the only one we saw in the video, he sees him, signals for him to come out, and within a few seconds he comes out, and the officer tells him to go that way and he follows the directions, right?

A.   True.  But it was the other officer who goes in to get him before the other officer saw it.  Because those two doors go to the same room.

Q.   Sure.  And the officer went down behind him maybe?

A.   Yeah.

Q.   And they both come out together.

A.   Correct.

Q.   Didn't seem to be objecting.  Right?

A.   No.

Q.   Going into the Senate Gallery, I don't know if we saw that video where he actually goes in through the door of the Senate Gallery, there wasn't any video of him going past a police line or overcoming police officers there, right, going into the gallery?

A.   No, not in the video.

Q.   In fact, the first encounter that you testified to is where he goes through the window, he turns to the left, which is towards the Senate Wing?

A.   Correct.

Q.   And then you kind of come up from the other direction along with, I think it's a command officer because he's got

the hat on and a little more brass -- and there's a group of like six or eight of you that kind of form a line there, and then maybe 20 protesters, rioters, whatever you want to call them, come the same direction that Mr. Bozell came from. Right?

A.   Yep.

Q.   We'll call it a standoff for lack of a better description.  But both sides just stand there and there's dialogue back and forth.  You described them as angry. Fair enough.  One individual there had a bat, didn't he?

A.   A bat?

Q.   Yeah.  A baseball bat.

A.   I don't remember a bat.  I'm sure they did.  I saw poles, shields.

Q.   Right.  But the individual with the baseball bat is the individual with Mr. Bozell, when he -- remember, he first -- he walks in and he goes all the way to the far left side, right, so he's on your extreme right.  You recall that?

A.   Yes.

Q.   And then he crosses over to the middle.  Correct?

A.   Okay.

Q.   But he's not like right in front of you, he's about four or five people deep, and he stands right next to a gentleman, and that gentleman had the bat.

A.   Okay.

THE COURT:  He's saying "okay."  But he says he doesn't recall a bat.

MR. SHIPLEY:  Well, I have that video number.  Can we --

THE COURT:  If you need to show the video, show the video.  But you can't get him to testify to something he doesn't recall.

MR. SHIPLEY:  Can we have 109.

BY MR. SHIPLEY:

Q.   Okay.  This is Mr. Bozell here in the hat.  Right?

A.   Okay.

Q.   And we'll see in just a moment he walks this way.  Go ahead and play.

   (Video played.)

   Right there.  See that gentleman in the green?  Want me to back it up a little bit?

A.   I see the gentleman in the green.  Sure, if you want to back it up.

Q.   Why don't we back it up just five seconds.  What's that in his hand, right there?  Baseball bat, right?

A.   It would appear to be some sort of metal --

Q.   Now, Mr. Bozell is -- he's not even in the frame at this moment.  Oh, no.  He's right here.  He's right here.

A.   Yeah, he's right there.

THE COURT:  And we can clarify that the officer is just

walking up from a distance away at this point.  He's not up there to see the bat yet.

MR. SHIPLEY:  Fair enough.  This video is in, so I'm asking him what he sees on the video.

BY MR. SHIPLEY:

Q.   Okay, keep going.

See Mr. Bozell, he walks over to the gentleman with the bat, right?  And then the gentleman puts the bat away?

A.   I don't see Mr. Bozell on the screen.

Q.   Let's back up a little bit.

(Video played.)

See?  There he is right there.

A.   Okay.

Q.   And then that gentleman puts the bat down.

Okay.  Can we go to 1013.

This is the composition that has the Secret Service audio over the top of the video.

A.   Okay.

Q.   And you've seen all these before.  Right?

A.   Yes.

MS. AKERS:  Would you like me to play?

MR. SHIPLEY:  Just go ahead and play it.  I'm not exactly sure where we're going to get to.  It's only 1:18 long.  Can we have the sound?

(Video played.)

Okay. Why don't you stop right there.

BY MR. SHIPLEY:

Q. So this is sort of the beginning of this whole sequence. Right?

A. Yes.

Q. You've got this one officer here?

A. Mm-hmm.

Q. And then there's several of you that come up behind to help him. Right?

A. Correct.

Q. And as the rioters come out -- and these are the people that have just come through the window -- as they're coming down this hallway --

THE COURT: Wait a minute. These are people who've just come what?

MR. SHIPLEY: Come through the window. This is the group that had just come in through the window. The broken windows.

THE COURT: Is it immediately after they came in the window?

MR. SHIPLEY: It's within like 30 seconds.

THE COURT: Go ahead and ask the witness.

BY MR. SHIPLEY:

Q. This is the group when they come in through the windows that they turn left and they end up right there. Correct?

A.   When they come up the stairs --

     -- (Simultaneous speaking) --

A.   -- the window, then the hall, then the stairs, the Grand Staircase, then they come around to the Majority Whip's office.  Now you're in the Ohio Clock --

Q.   And that's what we saw just before that with the crowd video with somebody following everybody going up the stairs?

A.   Correct.

Q.   And then they end up right here?

A.   The crowd video?  Or the --

Q.   Well, there was a crowd shot video.

A.   Okay.  You're talking about the one with -- the Secret Service one?

Q.   Yes, just before -- let's go back.

A.   Because the Secret Service one was the one before this, correct?

Q.   I understand.  Go ahead.

     (Video played.)

     So at this point Mr. Bozell, with the red, white, and blue hat and the blue sweatshirt, he hasn't even come in yet, right?  You haven't seen him enter.

A.   Correct.

Q.   All right.  Let's go ahead and play.

     (Video played.)

     Okay, stop.  This isn't immediately -- this is some time

later, right?  Now the whole crowd has moved forward and Mr. Bozell is not even there.

A.   Yeah.  I don't see him in the video.

Q.   So there's a gap in the video there where something happened but we don't have it recorded.

A.   Sure.  In this video, yes.

Q.   Now, let's pay attention real quick and see if we can see where the white smoke comes from.

     (Video played.)

     Stop.  Look at that right there?

A.   Red tube?

Q.   Yeah.

A.   Looks like a fire extinguisher.

Q.   Fire extinguisher.  And what's a fire extinguisher look like when it goes off?

A.   Smoke.  White.

Q.   You've seen this video.  Right?

A.   Yeah.

Q.   You testified on direct you didn't know where the smoke came from.

A.   I didn't then.

Q.   So your testimony is you just had never noticed that, that the guy is holding a fire extinguisher?

A.   I haven't gone through any of the videos with a fine-toothed comb looking at everybody's hands and what they

all are holding.

Q.   Fair enough.  I'm just asking you, you testified on direct that you didn't know where it came from, but if you look at this video, it's pretty obvious it comes right from that fire extinguisher.

A.   That would.

Q.   Okay.  I think you testified that given the events at this point in time -- and you'd already been involved in a few other things before this happened.  Right?

A.   Correct.

Q.   Seen the crowd, you knew what was happening, you knew that the building had been breached?

A.   I knew the building had been breached but I'd only seen the crowd before this from an obscured view of a window from the Cannon building.

Q.   But what I want to ask you about, just to confirm, that you said it, is you at this point were assuming everybody was a threat.

A.   Correct.

Q.   And that would be true for those who actually were no threat but you were operating under a worst-case scenario.

A.   Correct.

Q.   Now, in preparing either for this trial or other instances where you've testified -- and I don't know how many trials you've testified in, but you've testified before the

grand juries, right?

A.   Of course, yes.

Q.   And multiple different defendants have been involved. Right?

A.   Yes.

Q.   You learn the names of any of those defendants along the way?

A.   I've been told their names but I don't recall.

Q.   The big gentleman in the orange shirt kind of is prominent through --

A.   Oh, the crowd video?  Yeah, I don't know his name. I don't think I've been told his --

Q.   Ronald Sandlin?  You don't recognize Ronald Sandlin?

A.   No.

Q.   And the gentleman who actually jumped down from the railing, you ever heard the name Josiah Colt?

A.   No.

Q.   Okay.  But it wasn't -- this gentleman never jumped down from -- right?

A.   In the video footage, no.

Q.   Yeah, he walked out and then came in on the bottom.

A.   Yes.

Q.   Or --

A.   You did say that we never saw in the video him coming through, but he does appear in the footage in the chambers.

Q.   But -- fair enough.  There's no video that shows him jumping down and you didn't see him jump down, so that's all you can offer today?

A.   Correct.  That he was in the chamber.

Q.   Now, you made a comment about, you know, his movement of the camera, the C-SPAN camera, being suggestive of a desire to not have things filmed on the floor of the Senate?

A.   Yes.

Q.   There's more than one camera, right?

A.   There's multiple cameras.

Q.   Is there -- have you seen any video of him going around moving the other cameras so they wouldn't film things on the floor of the Senate?

A.   I haven't seen all the footage, but the footage I've seen, you did see him in that one particular footage move the camera, obscure its vision, and put it at the floor.

Q.   But pretty much all of that video is actually shot from the other cameras, isn't it?

A.   True.  But that doesn't mean he saw all those other cameras.

Q.   Well, if he had the presence of mind to maneuver one in such a way so that it wouldn't record the floor, it kind of makes sense that he would think about whether there were others, because there's clearly not just one C-SPAN camera.

A.   Well, that's why I made that one inference when you see

ROBISHAW - CROSS

him in the other video point at the other two cameras and it looks to me that he is appearing to instruct others to move those cameras --

Q.   What if he's pointing at the same camera that he had moved?

A.   Well, he wasn't in the right spot for that camera to be moved again because that camera would have been at the top left.  He was pointing at the top right of the screen.

Q.   We'll come back to that.  But it's fair to say -- we did have that composition video, shot from above --

A.   Correct.

Q.   -- where he's in different places doing different things. Right?

A.   Yes.  He has moved around the chambers.

Q.   And almost the entire time he's either on his phone or he's looking at his phone, right?

A.   Correct.  He was on his phone at one point.

Q.   And you testified that there's lots of video of other people looking at documents, opening up the desk drawers, sitting in the speaker's or the president's chair -- not the speaker because that's on the other side.

A.   Yep.

Q.   None of those videos show Mr. Bozell doing any of that.

A.   That's correct.

Q.   And when he walked out of the Senate Chamber -- we saw

that CCTV video from the camera, the stationary camera outside the Senate Chamber -- he walks out alone.  Right?

A.    Yes.

Q.    Well, actually, you're not too far behind him.

A.    I'm outside of the chamber in the hallway.  Yeah.

Q.    Oh, you're already outside the chamber --

A.    Yeah.  He comes out of the -- well, from what I remember of the video footage we just watched --

Q.    And then you follow --

A.    -- he comes out, I kind of like spin around, and then I think -- he comes out by himself at first and then there's another, and then we kind of move those individuals out.

Q.    Now, at some point, you went back into the chambers with several other officers once you had the manpower to kind of force those still inside to leave.

A.    Oversimplification, but I did go back into the chambers and at one point I was by myself for a while before more officers came in.

Q.    That's when you followed Mr. Chansley in by yourself, and you were alone with 25 or 30 or 40 people.  Right?

A.    Correct.

Q.    But at some point you had backup come to your assistance?

A.    Yes.

Q.    And once you had enough people in there, you were able to persuade the people on the --

A.   I wouldn't say so much me as the, you know, riot control MPD officers, accompanied by the few U.S. Capitol Police. They moved everybody out.

Q.   Okay.  Other law enforcement, whichever agency.

A.   Yes.  I was relieved when they came in.

Q.   But Mr. Bozell is already gone, right?

A.   I don't know.  I didn't see that footage.

Q.   Okay.

A.   I mean, I have seen the footage.  I just haven't seen -- specifically looking for this individual in those footages or videos before.  So I'm unsure of the time table.

Q.   But would it be fair to say that from the video that we did watch of him exiting the doors and going down that hallway the direction he'd come --

A.   Oh, I see what you're saying, yeah.

Q.   -- he wasn't escorted by police, he just came out by --

A.   Yeah.  He came out by -- I see what you're saying.  I'm sorry.  Yes, you're correct.  He did come out and we pointed him down towards the stairs.  I see what you're saying.

Q.   Of his own volition.  He wasn't being escorted out.

A.   Yeah.

Q.   And even at the very end, when he was with a group and the group comes down to the -- which door was that?

A.   North door.  That's what we call it.  I don't know its technical name.  We call it the north door.

ROBISHAW - CROSS

Q.   The door they actually exited?

A.   In the last video?

Q.   Yeah.  At the very end when he's actually heading out the door to the outside.

A.   Yeah.

Q.   He looked out one time and kept walking?

A.   Yeah.

Q.   He's with a group and the whole group has a few officers sort of around them and behind them, making sure they go where they're going.  Right?

A.   Yes.

Q.   No resistance.

A.   No.

        MR. SHIPLEY:  Can I have just a moment, Your Honor?

        THE COURT:  Certainly.

     (Defense conferring.)

        MR. SHIPLEY:  Thank you, Officer Robishaw.  Nothing further.

        THE WITNESS:  Thank you.

        THE COURT:  Redirect, Ms. Akers?

        MS. AKERS:  Briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MS. AKERS:

Q.   Officer Robishaw, on cross-examination you were asked about the interaction between the rioters and the officers who

you identified in plain clothes outside the Senate Gallery. Correct?

A.   Correct.  Yes.

Q.   And counsel said it wasn't my client, Mr. Bozell, going through the police line.  Correct?

A.   Correct.

Q.   I'm going to play for you Exhibit 435, which has been admitted.  And we're going to start at 5:05.

(Video played.)

What did you just see happening there?

A.   That the crowd in this video were assaulting the two plain clothes individuals to try to get into the Senate Gallery.

Q.   And do you see the person in blue who I circled right in the middle of the screen?

A.   I do.

Q.   Fair to say in the video you don't see him actually throwing the punches.  Right?

A.   That is fair, yes.

Q.   Also fair to say he was part of the group who was confronting the officers.

A.   Yes.  He is in that group that is assaulting the officers.

Q.   And based on your experience on January 6, even the people who weren't at the very front line at all times, how

did the other people in the group impact officers like yourself when you were doing your duty of trying to protect the building and the people in it?  How did those other people impact you?

A.   Like personally?  Like how I was affected that day, or -- I'm sorry.

Q.   Sure.  In your experience, where there times where you were outnumbered by the crowd?

A.   Oh, yes.  Pretty much all --

Q.   And so even, for example, in the Ohio Clock Corridor where that one rioter was face-to-face with you, it wasn't just him who was at the front of the line, there were other people there.  Right?

A.   Correct.  I viewed them as a group.  It wasn't just the one individual that I was dealing with; it was the group as a whole.

Q.   And how did there being a group as a whole, not just the person at the front line, but how did their being a group as a whole impact your ability to do your job?

A.   I mean, we weren't able to gain any sense of compliancy. We wanted everyone to leave.  They were obviously chanting and yelling.  We weren't able to, you know, escort them out or push them out of the building, whatever words you want to use. So in that line of the sense we couldn't establish a -- you know, protect the building because they had made their way in.

Q.   Is it more obstructive to you as an officer when there's a mob or a group of people as opposed to when there's one or two people?

A.   That is correct, yes.

Q.   You were also asked on direct examination about the fire extinguisher.  Correct?

A.   Yes.

Q.   And Mr. Shipley pointed out the fire extinguisher in that rioter's hand.  Correct?

A.   Yes.

Q.   When you were testifying on direct examination and you testified you didn't know what was in the air and you and your fellow officers were frightened, was that based on your recollection on January 6?

A.   Yes.  I was going with what I knew from the time, not so much the video.  I heard a loud noise.  It startled everybody. I had just dealt with the pipe bombs in the RNC and DNC, evacuating the building.  So it's kind of where my mind went to first, and then when, you know, you're mixed with a chemical, you're not looking for a fire extinguisher, there's smoke in the air and you're thinking worst-case scenario that now I'm breathing in some sort of toxin.

Q.   So that was your present perception on January 6 in the Ohio Clock Corridor when you were confronted by the mob of rioters who just came through the building?

A.   Yes.

Q.   You were also asked about your, I believe the word perception or assumption that people were threats.  Right? And I believe Mr. Shipley said you assumed that everyone was a threat even though there were people who were not a threat or something to that effect.  Do you remember that?

A.   Yes.

Q.   Did you perceive, by the time these people got through the windows or doors up to the Ohio Clock Corridor, did you perceive all of them to be a threat?

A.   Yes.

Q.   And why is that?

A.   Well, the assumption that everyone that was gaining entrance into the building was a threat because we heard on the radio, before even getting into the Capitol, that they were using violence to push back the front line officers, what we call Civil Disturbance Unit or CDU.  Those guys, you could hear them on the radio asking for additional officers, so obviously there was some sort of violence, force, being pushed upon the officers that were there, being pushed back.

Then also the radio traffic that the window had been busted out and that people, you know, were entering the building now.  I mean, a window doesn't break unless you put force upon it to break the window.  So I assumed then too that the -- I'm sorry.  I lost my train of thought.

But, yeah, so that they broke out the window, so violence was used then to gain entry into the building, to make their way up to us.  And between that time and the time that I, you know, find myself in the Ohio Clock Corridor, I don't know what had transpired.  You know, I didn't know they were chasing Officer Goodman or if they had assaulted other officers.  I had no knowledge of what other additional violent means may have been used up to that point.  So that's why I kind of made my assumption.

MS. AKERS:  Thank you, Officer.

THE WITNESS:  Yes, ma'am.

MS. AKERS:  No further questions, Your Honor.

THE COURT:  All right.  Thank you very much, Officer. You may step down.  We appreciate you coming.

THE WITNESS:  Thank you, sir.

(Witness steps down.)

MS. AKERS:  Your Honor, I would request, given the stipulations that we received this morning signed, and so we were able to cut a huge chunk of our witnesses, our last remaining witness is our agent, who won't be able to finish in 20 minutes for sure.

THE COURT:  Why don't we do 15 minutes of the introductory stuff with your agent.  If you really need to wait until tomorrow morning, I'll give you that latitude, but --

MS. AKERS:  I would ask that, Your Honor.  We had a dozen other witnesses lined up to go and we received the stipulations this morning.  We don't have all that much background information anyway because the defense has in fact stipulated to identification and the cell phone and things like that.  So we're really just going to dive right into the cell phone tomorrow.

THE COURT:  How long do you think his testimony will take?

MS. AKERS:  I am terrible at this estimation game. I would say --

THE COURT:  You're a lawyer.

MS. AKERS:  Yes.  No more than two hours?

THE COURT:  All right.

MS. AKERS:  Is my best guess.

THE COURT:  All right.

MS. AKERS:  But please don't hold that against me if I'm terribly wrong.

THE COURT:  All right.  Tomorrow morning I have something at eleven o'clock.  Is that the time -- someone has to look at the calendar for me.  Eleven o'clock.  A sentencing in a January 6 case.  Which will take a good hour and a half or so.  So we probably won't have --

THE DEPUTY CLERK:  You have two matters.

THE COURT:  The second matter is pretty short, though.

So we probably won't have a normal schedule tomorrow. We'll probably have what I'll call an early lunch break and then we'll resume again 12:30-ish or so. So we need to keep that in mind.

I'd like to get the testimony of your agent done tomorrow, but also we have a potential defense case. And I'd like to get that going well underway tomorrow, perhaps completed tomorrow. So be mindful of that. If you need the time now, I'll go ahead and give you that latitude, but we're going to crack the whip tomorrow and --

MS. AKERS: Understood. I think it's reasonable that we'll finish tomorrow. And I think it'll be more efficient if we take those 15 minutes and dedicate them to being efficient tomorrow.

THE COURT: Any big objection to this, Mr. Shipley?

MR. SHIPLEY: No, Your Honor. I just want to put one thing on your radar just so -- I don't think it's a problem, but if unforeseen circumstances make it a problem I just want you to know. 12:30 on Friday I have a probation revocation hearing with Judge Howell. It was originally set for 11:00. I told her I expected to be in here in trial at 11:00. She specially set it for me during the lunch hour.

THE COURT: We'll accommodate that over the lunch hour, and you just won't get lunch.

THE SHIPLEY: I don't eat lunch during trials. My wife

loves that because it's the one chance I have to actually lose weight.

THE COURT:  All right.  So we'll be ready to go at 9:30 tomorrow morning.  Actually, how about if we're ready to go at 9:15 since I have to stop at 11:00?  Does that cause a problem?  I know schedules sometimes are --

MR. SHIPLEY:  I think the only problem it causes, Your Honor, there's five juries going right now.  So the entrances are crowded in the mornings.  I don't know that we'd do any worse at 9:15 or 9:30.

THE COURT:  Yeah, I don't think there's going to be any difference.  It just means you have to get here 15 minutes earlier in order to get in than you otherwise would.  I know we have a lot going on in the courthouse.  Thank you.  All right.  See you ready to go at 9:15 instead of 9:30, and I appreciate the flexibility everyone's showing.  See you then.

Oh, and by the way, I think out of courtesy to you, I think I will give you both tomorrow morning what I'll call the legal framework, which is, in other words, what I see as the elements of the various counts.  Equivalent to jury instructions.  And you've both given some input on that and I've taken that into account.  But I think if I give it to you, that's fairer, so you can be mindful of it when you do your closings.  All right?  Thank you.

(Proceedings adjourned at 4:02 p.m.)

167

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne